UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIVA ON THE RIVER HOMEOWNERS ASSOCIATION,<br>Plaintiff,<br>v.<br>THE MANAGEMENT ASSOCIATION, INC. DBA THE MANAGEMENT TRUST,<br>Defendant. | Case No. 2:24-cv-02782-CSK<br><br>ORDER<br><br>(ECF No. 51) |

Pending before the Court is Plaintiff's motion for class certification pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).[1] (ECF No. 51.) A hearing was held on August 11, 2026. Attorneys Michael Ram, Jeffrey Cereghino, Amalee Beattie, and Logan Graham appeared as counsel for Plaintiff; attorney Fletcher Arnold appeared as counsel for Defendant. (ECF No. 77.)

For the reasons that follow, the Court DENIES Plaintiff's motion for class certification.

---

[1] This case proceeds before the undersigned pursuant to 28 U.S.C. § 636(c) for all purposes, including the entry of judgment, pursuant to the consent of all parties. (ECF Nos. 5, 10, 11.)

# I. BACKGROUND

## A. Facts

A common interest development ("CID"), also referred to as a homeowners' association or "HOA", is a type of non-profit organization, led by a board consisting of volunteer layperson homeowners, with the goal of maintaining the homes and properties within the development community. Compl. ¶¶ 9, 10 (ECF No. 1). To assist it in running its day-to-day operations, an HOA will commonly hire a professional management company. *Id.* ¶ 10. As part of its duties, a HOA management company typically maintains deposit accounts that hold the HOA's fee assessments collected from the HOA's members. *Id.* ¶ 11. These deposit accounts are either operating accounts, which an HOA uses for its daily deposits and withdrawals for routine expenses such as landscaping, insurance, or utilities; or reserve accounts, which hold reserve funds in the amounts required by the HOA's governing documents or by law. *Id.* ¶ 12.

Plaintiff Riva on the River Homeowners Association is an HOA consisting of 252 condominiums and common areas in West Sacramento, California. *Id.* ¶ 4; Declaration of Denise Quenell ¶ 3 (ECF No. 51-3). From December 2009 to 2018, Plaintiff retained Defendant The Management Association, Inc. (doing business as The Management Trust) as Plaintiff's management company. Compl. ¶ 15; Quenell Decl. ¶ 5. Under this agreement, Defendant managed Plaintiff's operating and reserve accounts, including by collecting assessments, maintaining account records, and disbursing payments. Compl. ¶¶ 17-18; Quenell Decl. ¶ 6. Also pursuant to the parties' agreement, Plaintiff held its deposit accounts in a bank of Defendant's choosing, namely, Pacific Western Bank. Compl. ¶ 18; Quenell Decl. ¶ 7. Defendant provides to each of its HOA clients an identical disclosure (among others), namely, that Defendant's affiliate company, Lien & Accounting Services, "is paid directly by the banks and management firms for which it provides" banking services, including "lock box processing, EFT processing, reconciliation processing and credit card services among others." Declaration of Alan Jenkins ¶ 5, Exh. A at 2 (ECF No. 64-2).

According to Plaintiff, it recently discovered that Defendant had entered into arrangements with chosen banks to deposit the funds of Plaintiff and other HOAs at those banks in exchange for payments which Defendant refers to as "earnings credits." Compl. ¶ 33; Quenell Decl. ¶ 8. The structure of a typical earnings credit arrangement between management companies and banks, including that at issue here, is somewhat disputed by the parties. Defendant asserts that earnings credits for business checking accounts are derived from a bank's calculation of how much the bank can profit from the amounts deposited in the account; based on this calculation, the bank may issue earnings credits by: (1) offsetting fees that it imposes on the transactions associated with the account; and, if the calculation results in an excess over the amount of fee offsets, (2) issuing direct payments to "third party vendors that provide banking services on behalf of the account holder." Def. Opp'n at 9-10 (ECF No. 64); *see also* Declaration of Cathleen Carmichael, Exh. A at 5 ¶ 12 (ECF No. 64-1). The earnings credit calculation depends in part on the extent of an account's deposits with the bank, which generally must be high for earnings credits to issue. While a management company may be able to collect earnings credits by consolidating the deposit accounts of multiple HOA clients at the same bank, a single HOA typically lacks sufficient deposited funds and bargaining power to contract with the bank for a similar arrangement. *See* Def. Opp'n at 10; Carmichael Decl., Exh. A at 7-8 ¶ 21; Declaration of Kevin Liu, Exh. A, Deposition of Alan Crandall at 54:10-21, 132:7-15 (ECF No. 64-3). Defendant maintains that the distribution of earnings credits does not necessarily affect the amount of interest earned by a HOA's deposit account. Def. Opp'n at 13; Carmichael Decl., Exh. A at 6 ¶ 13.

In contrast, Plaintiff characterizes the earnings credits as essentially kickback payments from banks to management companies solely to incentivize management companies to deposit their HOA clients' funds at the bank. Pl. Mot. at 9 (ECF No. 51); Declaration of Alan Crandall ¶ 15 (ECF No. 51-5). Plaintiff's expert estimates that 90 percent of "large" management companies participate in such an earnings credit arrangement. Liu Decl., Exh. A, Crandall Depo. at 91:4-10.

Plaintiff alleges that, over the class period from January 1, 2012 to the present, Defendant received over $33 million in earnings credit payments and failed to ever disclose the nature or amount of these payments. Pl. Mot. at 9, 10. Defendant did not pass on any portion of those earnings credits to Plaintiff or Defendant's other HOA clients. Compl. ¶ 21; Quenell Decl. ¶ 8.

**B. Procedural Posture**

Plaintiff initiated this action on October 9, 2024, asserting the following claims: (1) breach of contract; (2) unlawful business practices in violation of California's Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq.* ("UCL"); (3) breach of fiduciary duty; (4) unfair business practices in violation of the UCL; and (5) unjust enrichment. Compl. ¶¶ 34-70. Defendant filed an answer on November 19, 2024. (ECF No. 8.) On July 17, 2025, the Court modified the January 30, 2025 pretrial scheduling order (ECF No. 19) and set a briefing schedule for Plaintiff's forthcoming motion for class certification. 7/17/2025 Order (ECF No. 29).

On January 12, 2026, Plaintiff filed a motion to certify a class pursuant to Rule 23(b)(2) and Rule 23(b)(3) as to Plaintiff's second, third, and fourth causes of action. Pl. Mot. Following several stipulations and orders to extend the briefing deadlines for Plaintiff's class certification motion, *see* 3/30/2026 Order (ECF No. 57); 4/14/2026 Order (ECF No. 60), Defendant filed its opposition brief on April 21, 2026. Def. Opp'n. Plaintiff filed a reply on June 19, 2026. Pl. Reply (ECF No. 68).

On June 26, 2026, Defendant submitted objections to new evidence Plaintiff presented in its reply, and requested either that the Court disregard the evidence or provide Defendant with an opportunity to file a sur-reply responding to the new evidence. (ECF No. 70.) The Court granted Defendant leave to file a sur-reply. 7/2/2026 Order (ECF No. 72). Defendant filed its sur-reply on July 16, 2026. (ECF No. 73.) A hearing was held on Plaintiff's motion for class certification on August 11, 2026. (ECF No. 77.) On August 21, 2026, Defendant filed a notice of supplemental authority. (ECF No. 80 (citing *Rusoff v. Happy Grp., Inc.*, No. 24-7706, 2026 WL 2387098, at *3 (9th Cir. Aug.

17, 2026).) Briefing on Plaintiff's motion is complete.[2]

Additionally, on July 29, 2026, Plaintiff filed a notice attaching a communication purportedly sent by Defendant to Plaintiff Riva's member homeowners. (ECF No. 74.) The communication is addressed to the "Riva on the River Homeowner" and describes the action, Defendant's position, and Defendant's prior $100,000 settlement offer to Riva's board of directors. *Id.*, Exh. A (ECF No. 74-1). Defendant filed a response on August 5, 2026, denying that counsel for Defendant was involved in preparing or distributing the communication and denying that the communication violated any legal or ethical rules. (ECF No. 75.) Because Plaintiff acknowledged in its filing and confirmed during the August 11, 2026 hearing that it is not asking the Court for any specific relief, no action will be taken regarding Plaintiff's notice. (*See* ECF No. 74 at 2, 3.)

## II. LEGAL STANDARDS

### A. Article III Standing

Named plaintiffs who purport to represent a class must establish Article III standing. *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). To have Article III standing, a plaintiff must show (1) it has suffered an "injury in fact," (2) its injury is "fairly traceable" to the defendant's actions, and (3) its injury will likely be "redressed" by the action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Under the "injury in fact" prong, a plaintiff must demonstrate an "invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560.

"In a class action, this standing inquiry focuses on the class representatives." *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir. 2019). "If none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of

[2] The parties also submitted multiple unopposed requests to seal related to their class certification briefing. (*See* ECF Nos. 50, 53, 63, 65, 67, 69.) Because this Order does not reproduce any sealed content and descriptions of any sealed exhibits are from public portions of the parties' filings, this Order is not subject to sealing.

himself or any other member of the class." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). Standing must be proven "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "Because the preponderance of the evidence standard applies at the class certification stage, standing at the time of class certification must be established by a preponderance of the evidence." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1051 (2025). "At the class certification stage that means Plaintiff's case must be able to withstand a rigorous analysis that will entail some overlap with the merits of the underlying claim." *Torres v. Air to Ground Servs., Inc.*, 300 F.R.D. 386, 393 (C.D. Cal. 2014) (citation modified). In addition, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citing *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008); *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

**B. Class Certification**

Plaintiffs must "affirmatively demonstrate" compliance with the Federal Rules that govern class certification. *Wal-Mart*, 564 U.S. 338, 350 (2011). A proposed class can be certified only if the court is persuaded the class meets the requirements of Rule 23(a) and (b), after a "rigorous analysis." *Id.* at 350-51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Rule 23(a) sets out four prerequisites for every class:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to these four requirements, the Court must find that at least one of the following three conditions under Rule 23(b) is satisfied: (1) the prosecution of separate

actions would create a risk of: (a) inconsistent or varying adjudications, or (b) individual adjudications dispositive of the interests of other members not a party to those adjudications; (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b).

The party seeking class certification bears the burden of demonstrating that the requirements of Rule 23(a) and Rule 23(b) are satisfied by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). "The decision to grant or deny class certification is within the trial court's discretion." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). The Court's class certification analysis "may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (quoting *Wal-Mart*, 564 U.S. at 351). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.

## III. DISCUSSION

Plaintiff raises the following claims on behalf of itself and the proposed class: (1) breach of contract for Defendant's failure to act in the class members' best interest by not disclosing the alleged earnings credit arrangement; (2) violation of the UCL for unlawful business practices arising out of violations of California Civil Code §§ 5375, 5375.5, and 5380; (3) breach of fiduciary duty based on Defendant's undisclosed earnings credit arrangement; (4) violation of the UCL for unfair business practices arising out of Defendant's undisclosed earnings credit arrangement; and (5) unjust enrichment arising out of the same. Compl. at 10-15. As Plaintiff stated in its motion and confirmed at oral argument, Plaintiff moves to certify only claims two (unfair competition claim

based on unlawful business practice), three (breach of fiduciary duty), and four (unfair competition claim based on unfair business practice); Plaintiff does not move to certify claims one (breach of contract) or five (unjust enrichment). Pl. Mot. at 8 n.1.

As to claims two through four, Plaintiff seeks to certify the following class under Rule 23(b)(2) and Rule 23(b)(3):

> All CIDs and/or co-ops in Arizona, California, Colorado, Nevada, Oregon, and Washington (1) that engaged [Defendant] to manage their CID/co-op from January 1, 2012, to present; and (2) whose money [Defendant] placed into a bank that paid [Defendant] based on the amount of funds [Defendant] deposited.

Pl. Mot. at 8. As to claims two through four, Plaintiff also seeks to certify the following California subclass under Rule 23(b)(2) and Rule 23(b)(3):

> All CIDs and/or co-ops in California (1) that engaged [Defendant] to manage their CID/co-op from January 1, 2012, to present; and (2) whose money [Defendant] placed into a bank that paid [Defendant] based on the amount of funds [Defendant] deposited.

*Id.* at 8-9.[3] Plaintiff accordingly requests that notice be given to class members pursuant to Rule 23(c)(2)(B), that it be appointed as class representative, and that its counsel be appointed as lead counsel. *Id.* at 2.

In opposition, Defendant argues that Plaintiff's motion for class certification fails because Plaintiff lacks standing due to its failure to establish a concrete injury. Def. Opp'n at 6, 19-22. Defendant also argues that, even if Plaintiff has established standing, class certification under Rule 23(b)(3) is improper because individual issues predominate over common issues, *id.* at 22-29, and a class action would not be superior to individual litigation, *id.* at 31-32. Defendant also argues that class certification under Rule 23(b)(2) is improper because Plaintiff seeks individual money damages. *Id.* at 29-30. Finally, Defendant argues Plaintiff has not established typicality or adequacy under Rule 23(a). *Id.* at 30-31.

/ / /

---

[3] Plaintiff has narrowed its proposed class and subclass definitions from the Complaint. *Compare* Pl. Mot. at 8-9, 8 n.1, *with* Compl. ¶ 24.

### A. Standing

Defendant argues that Plaintiff lacks standing to sue and bring a class action on the following grounds. First, Defendant argues that, because Plaintiff and the class members lack a legal entitlement to the earnings credits that Defendant receives from a bank in exchange for holding class members' deposit accounts with the same bank, the entire class lacks standing to claim that Defendant injured them by wrongfully taking possession of their property. Def. Opp'n at 11 & n.22, 18 n.47. Second, to the extent Plaintiff's claims are based on alleged injuries stemming only from Defendant's inadequate disclosure or non-disclosure of these earnings credits, Defendant argues that Plaintiff lacks standing because the alleged inadequacy of Defendant's disclosure did not cause Plaintiff any damage where Plaintiff had actual knowledge and Plaintiff would not have acted differently if Plaintiff had timely received adequate information. *Id.* at 19-22.

#### 1. Breach of Fiduciary Duty (Claim Three)

"The elements for a breach of fiduciary duty claim are: (1) the existence of a fiduciary duty; (2) a breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Winebarger v. Pennsylvania Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070, 1091 (C.D. Cal. 2019) (citing *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (1995)).

Plaintiff argues that it suffered an injury in fact because Defendant breached its fiduciary duty by failing to adequately disclose its earnings credit arrangement. *See* Pl. Reply at 6-8. This argument fails. "Plaintiff must still allege some injury or deprivation of a specific right that arose from a violation of that duty in order to meet the injury-in-fact requirement. Plaintiff cannot claim that . . . a deprivation of her entitlement to that fiduciary duty, in and of [itself] constitutes an injury-in-fact sufficient for constitutional standing." *Draney v. Westco Chemicals, Inc.*, 2019 WL 6465510, at *3 (C.D. Cal. Dec. 2, 2019). Plaintiff's cited authorities are unavailing. First, Plaintiff relies on two non-binding concurring opinions that do not directly conclude that a breach of fiduciary duty alone

creates a concrete injury for Article III standing. *See Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 292 n.2 (6th Cir. 2018) (Thapar, J., concurring); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 344 (2016) (Thomas, J., concurring)). Plaintiff also cites to *Bruce M. v. Sutter West Bay Medical Group Health & Welfare*, but this case is distinguishable because the plaintiff there alleged she was wrongly denied benefits to which she was entitled under an ERISA plan, which deprived her of contractually defined benefits. 2023 WL 6277269, at *3 (N.D. Cal. Sept. 25, 2023). In contrast, here Plaintiff has not shown a deprivation of contractual benefits. Thus, Plaintiff fails to show that a bare violation of Defendant's fiduciary duty to Plaintiff may constitute an injury in fact.

The Court turns next to earnings credit (monetary injury) and informational injury.

*a. Earnings Credits (Monetary Injury)*

Defendant argues that Plaintiff lacks standing because there is no legal entitlement to "earnings credits." Defendant cites several cases in support. Def. Opp'n at 11 n.22. For example, in *McFerrin v. Old Republic Title, Ltd.*, the plaintiffs contracted with the defendant to provide escrow services for the sale of their Seattle home. 2009 WL 2045212, at *1 (W.D. Wash. July 9, 2009). The defendant pooled plaintiffs' and other clients' real-estate transaction funds into a single trust account, causing the defendant's bank to transfer "earnings credits" to the defendant in an amount calculated from the total amount of client funds in the trust account. *Id.* at *3, 7. These earnings credits were used to offset bank service charges incurred by the defendant. *Id.* at *3. On a motion for summary judgment, the district court held that the plaintiffs lacked standing to assert certain claims, including for breach of fiduciary duty and for violation of Washington's Consumer Protection Act, based on allegations that the defendant had wrongly retained the earnings credits. *Id.* at *7. The court concluded that customers of escrow companies "do not sustain an injury in fact when an escrow company receives earnings credits" because such earnings credits belong to the escrow companies in the first instance. *Id.*

The reasoning of *McFerrin* relies in part on *Washington Legal Foundation v. Legal Foundation of Washington*, a Ninth Circuit case involving a similar arrangement where

escrow and title companies that deposited their customers' real-estate transaction funds with banks could receive earnings credits to offset bank fees. 271 F.3d 835, 845 (9th Cir. 2001). The plaintiffs there challenged the legality of Washington's Interest on Lawyers' Trust Account ("IOLTA") program, arguing in part that the IOLTA program violated the Takings Clause by causing banks to reduce their distribution of earnings credits to escrow and title companies, which in turn caused the escrow and title companies to raise the prices of their services on their customers. *Id.* at 858. The Ninth Circuit stated that, for purposes of a Takings Clause analysis, the alleged loss of earnings credits to escrow and title companies did not imply that the IOLTA program had a direct economic impact on customers because "the earnings credits were nothing but incentive payments to repeat customers, the escrow companies, to use one bank rather than another, and were never the property of the escrow companies' customers." *Id.* at 859-60.

The "earnings credit" arrangement alleged by Plaintiff is similar to those in the aforementioned cases. According to Plaintiff's expert, Alan Crandall, the earnings credits at issue in this case consist of "incentives to management companies to consolidate their deposit relationships with them by encouraging their [HOA] clients to deposit funds in their banks," namely by "providing direct cash payment to the management company for the deposits 'owned' by their HOA customers." Crandall Decl. ¶¶ 13, 14. These incentives are based on the amounts deposited with the bank. *Id.* ¶ 19. Thus, as in *McFerrin* and *Washington Legal Foundation*, the earnings credits here are incentives for Defendant to enter into a banking relationship with a bank. The fact that these incentives are "expressly calculated based on the amount of customer funds that were placed in the trust account" does not overcome the fact that "the earnings credits do not belong to the customers in the first place." *McFerrin*, 2009 WL 2045212, at *7. Accordingly, Plaintiff and the class members lack standing to sue on grounds that they had an entitlement to earning credits.

Plaintiff raises several arguments in an attempt to distinguish the facts here. None succeed. First, Plaintiff argues that this case differs from Defendant's cited cases

because those cases involved earnings credits that only contributed to offsetting a middle agent's bank fees, whereas here, Defendant's earnings credits were direct cash payments to Defendant. Pl. Reply at 5. Plaintiff explains that the transition from fee offsets to cash payments resulted from changes in banking regulations from the Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010. *Id.* However, Plaintiff does not explain why an earnings credit consisting of cash payments differs materially from an earnings credit consisting of fee offsets, especially when both constitute, at bottom, economic incentives for a management company to do business with a specific bank. For instance, in *Sypolt v. Talon Group*, the plaintiff alleged that the defendant obtained a "low interest line of credit . . . . based on the average escrow balance" that the defendant maintained with the bank. 2009 WL 497133, at *2 (W.D. Wash. Feb. 26, 2009). Even though this line of credit was not a mere fee offset and could be used to purchase short-term investments from the bank, and thereby generate separate income, the district court concluded that the plaintiff lacked standing to sue for these benefits because the line of credit "arises out of the escrow company's relationship with the bank and would not otherwise be available to an individual customer." *Id.* at *3.

Similarly here, the earnings credit arrangement arises primarily out of a management company's relationship with a bank. To this point, Defendant submits evidence indicating that even if Defendant had not received earnings credits, those funds (to the extent of any excess over fee offsets) would not have been otherwise passed on by a bank to the client HOAs. *See* Def. Opp'n at 10; Liu Decl., Exh. A, Crandall Depo. at 131:4-24. Rather, earnings credits come from a management company's unique capability to aggregate the funds of multiple HOAs and deliver significant amounts of consolidated deposits to a bank for the bank's business advantage. *See* Liu Decl., Exh. A, Crandall Depo. at 131:18-132:15; Crandall Decl. ¶ 13. Plaintiff does not point to any evidence to the contrary. Thus, Plaintiff fails to articulate why, as a third party, Plaintiff should be entitled to incentives offered by banks to draw business from Defendant, even if those incentives include cash payments.

Second, Plaintiff argues that, unlike an escrow company, Defendant is a "direct trustee of each of its HOA funds." Pl. Reply at 4. This argument also fails to establish a material distinction. Assuming that Defendant acted as a trustee for Plaintiff, the earnings credits at issue here originate not from the fiduciary relationship between Plaintiff and Defendant but from the banking arrangement entered into between Defendant and the bank. Thus, as district courts in the Western District of Washington have held in the escrow-agent context, Plaintiff lacks any entitlement to the earnings credits in the first instance. *See McFerrin*, 2009 WL 2045212, at *7; *Jankanish v. First Am. Title Ins. Co.*, 2009 WL 779330, at *5, 6 (W.D. Wash. Mar. 23, 2009) (holding plaintiffs lack standing to assert Real Estate Settlement Procedures Act and fiduciary duty claims based on earnings credits allegations and reasoning that "Plaintiffs would be unable to earn the credits individually because they arise solely from the relationship between the bank and the escrow company").

Third, although Plaintiff cites various cases in support of its standing arguments, these cases are distinguishable. *See* Pl. Reply at 6 (citing *Bruce M.*, 2023 WL 6277269, at *3 (holding plaintiff suffered concrete injury where denied health benefits under ERISA); *Wit v. United Behav. Health*, 79 F.4th 1068, 1082 (9th Cir. 2023) (similar where plaintiff alleged defendant administered ERISA health plans in its financial self-interest)); Pl. Mot. at 18 (citing *Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272 (D. Conn. 2013)). Plaintiff cites *Haddock v. Nationwide Financial Services* to support its claim that "[c]ourts have certified breach of fiduciary duty cases where fiduciaries fail to disclose secret profits." Pl. Mot. at 18. However, this case did not consider the issue of standing and is factually distinguishable. In *Haddock*, a defendant contracted with ERISA pension benefit plans to selectively offer certain mutual funds as investment options for the plans. 293 F.R.D. at 276. By secretly prioritizing the mutual funds that offered revenue-sharing payments to the defendant, the defendant allegedly breached its fiduciary duties of loyalty and prudence to the plaintiffs under ERISA. *Id.* at 277, 283. Here, unlike in *Haddock*, it is unclear how Defendant's alleged failure to disclose the earning credits

affected the quality of services that it rendered to Plaintiff. In fact, the evidence indicates that earnings credits have insignificant impacts on the quality of a given bank's services to a management company's HOA client. *See* Crandall Decl. ¶ 15 ("Services were seen as standard across the HOA banks."). Thus, *Haddock* does not help Plaintiff establish a monetary injury. The other cases Plaintiff cites, including a case involving a fraudulent investment scheme, are likewise distinguishable. *See* Pl. Mot. at 18 (citing *Compound Prop. Mgmt. LLC v. Build Realty, Inc.*, 343 F.R.D. 378 (S.D. Ohio 2023)).

Finally, Plaintiff appears to present evidence that Defendant's earnings credit arrangement could not have constituted legitimate compensation for services provided by Defendant to the bank because the arrangement worked backwards: first, an earnings credit calculation would be made to determine the amount available for fee offsets, after which, if a surplus existed, Defendant would send the bank a post hoc invoice matching the amount of available surplus. Pl. Reply at 2-3. This explanation is irrelevant as to a finding of injury, however, because if Plaintiff is not entitled to the earnings credits in the first instance, Plaintiff cannot challenge how Defendant receives them. Further, to the extent Plaintiff asserts that Defendant charged both Plaintiff and the bank for the same services, *see id.* at 2, Plaintiff has not alleged such an injury in the Complaint or otherwise argued that it has suffered an injury based on a theory of fraudulent double billing.

Accordingly, because Plaintiff has not established that any party other than Defendant is entitled to the earnings credits it receives from its banks, neither Plaintiff nor any class member has standing to sue based on an alleged monetary injury.

*b. Informational Injury*

The Court agrees with Defendant that if Plaintiff and other proposed class members are to show an actual, concrete injury at all, it must be an informational injury based on Defendant's alleged non-disclosure of its earnings credit arrangement. *See* Def. Opp'n at 18 n.47. Defendant argues, however, that Plaintiff cannot establish its individual standing on this ground because Plaintiff did not suffer a concrete injury

resulting from any allegedly inadequate disclosure. *Id.* at 19-22.

"A 'concrete' injury must be '*de facto*'; that is, it must actually exist. . . . [T]he adjective 'concrete[]' [means] 'real,' and not 'abstract.'" *Spokeo*, 578 U.S. at 340. Although a concrete injury may be based on a deprivation of information, "an asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442 (citation modified). In other words, an informational injury must have "downstream consequences from failing to receive the required information." *Id.* (citation modified).

Courts have held that a plaintiff lacks standing for failure to show "downstream consequences" of an asserted informational injury when the plaintiff fails to supply affirmative evidence that the information would have affected the plaintiff's subsequent decision-making. For example, in *Merck v. Walmart, Inc*, 114 F.4th 762 (6th Cir. 2024), the plaintiff sued Walmart under the Fair Credit Reporting Act for failing to provide a complete consumer report detailing his prior misdemeanor conviction, which he had inadvertently failed to disclose when applying to Walmart for employment. *Id.* at 768. The Sixth Circuit held that, to assert an informational injury for Article III standing at summary judgment, the plaintiff needed to demonstrate not just that Walmart denied him certain information but that "[t]he denied information . . . specifically relate[s] to some negative outcome that the plaintiff suffered because he was unable to use that information to his benefit." *Id.* at 776. Although the plaintiff asserted he had suffered an informational injury based on Walmart's failure to explain that his offer of employment had been rejected due to his failure to disclose a prior conviction, he failed to "identify specific evidence that he could have used the denied information to create some material benefit (or avoid some adverse consequence) to himself." *Id.* at 777-78. Specifically, the plaintiff made "no mention of anything that he could—or would—have done differently to find employment had he known the true basis of his Walmart rejections." *Id.* at 778. Accordingly, the plaintiff failed to meet his burden of establishing an informational injury on summary judgment. *Id.* at 779.

Here, Plaintiff argues it suffered an informational injury when Defendant "failed to disclose the true nature and extent of its payment arrangements" because, "[h]ad [Defendant] disclosed its deals, Riva and other class members would have had the opportunity to negotiate receiving some of the economic benefits [Defendant] instead kept for itself." Pl. Reply at 7. This theory fails because Plaintiff has not provided any evidentiary support to show how it would have acted differently in negotiating with Defendant if Defendant had adequately disclosed the earnings credits, or how the outcome of those negotiations would have been different than the actual services agreement that Plaintiff and Defendant entered into.

Further, given Plaintiff's lack of evidence, its theory of informational injury is speculative. Plaintiff's asserted informational injury relies on multiple conditions and chain of possibilities going in its favor, namely, that: (1) if Plaintiff had received an adequate disclosure, it would have demanded to renegotiate with Defendant for a better services agreement; (2) if Plaintiff had so demanded, Defendant would have agreed to enter into further negotiations; and (3) if Defendant and Plaintiff had negotiated with the earnings credits in mind, this would have resulted in a more favorable arrangement for Plaintiff. "Maybe the chain of events would have unfolded the way plaintiff implicitly assumes, but there is no reason to think so. This 'speculative chain of possibilities does not establish that [plaintiff's] injury' was 'fairly traceable' to defendants' alleged violations." *Quieju v. La Jugueria Inc.*, 2023 WL 3073518, at *2 (E.D.N.Y. Apr. 25, 2023) (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 (2013)).

For similar reasons, Plaintiff fails to establish an informational injury based on its unsupported, speculative conclusion that, due to Defendant's non-disclosure, "HOAs were unable to go to banks to negotiate for better interest rates or a portion of the kickbacks that the banks were paying." Pl. Reply at 4. Plaintiff presents no evidence that banks would have provided better interest rates to HOAs; that Plaintiff or other HOAs would have individually had high enough deposited funds to receive any earnings credits from banks when the HOA accounts were not consolidated together by a management

company; or that banks would have provided a portion of earnings credits directly to individual HOAs rather than to the management company that consolidated multiple HOA clients. To the contrary, Plaintiff's own expert Crandall suggests otherwise where he opines that 90 percent of "large" management companies participate in earnings credit arrangements with banks. *See* Liu Decl., Exh. A, Crandall Depo. at 91:4-10. Plaintiff's own experience with other management companies also further suggest Plaintiff's injury claims here are speculative where other management companies also received payments from banks and, despite having actual knowledge of this, Plaintiff still entered into contracts with the management company rather than negotiating directly with the bank, and there was no evidence that Plaintiff received a portion of any earnings credits from the bank. *See* Def. Opp'n at 20-21; Liu Decl., Exh. C, Quenell Depo. at 181:13-24, Exh. H (redlined draft of contract with Plaintiff and Action Property Management) at H-3, Exh. J (executed contract with Plaintiff and Action Property Management) at J-2, Exh. K (Plaintiff's Sunwest Bank signature card) at K-5, Exh. L (redlined draft of contract with Plaintiff and Silvercreek) at L-5, Exh. M (executed contract with Plaintiff and Silvercreek) at M-4.

Accordingly, Plaintiff fails to establish an informational injury based on Defendant's purportedly inadequate or non-disclosure of its earnings credit arrangement because Plaintiff has not shown it suffered "downstream consequences" from failing to receive such a disclosure from Defendant.

2. Unfair Competition Claims (Claims Two and Four)

"To bring a UCL claim, a plaintiff must show either an (1) unlawful, unfair, or fraudulent business act or practice, or (2) unfair, deceptive, untrue or misleading advertising." *Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033, 1043 (9th Cir. 2003) (citation modified); Cal. Bus. & Prof. Code § 17200. The UCL "establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). "The unlawful prong of the UCL requires that the plaintiff sufficiently plead some

separate unlawful offense." *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099, 1113 (E.D. Cal. 2024), *aff'd*, 2026 WL 125195 (9th Cir. Jan. 16, 2026). The unfair prong is "determined in one of two ways: (1) by establishing that the conduct offends some legislatively declared policy (the 'tethering' test), or (2) by weighing the utility of the conduct against the harm to the consumer (the 'balancing' test)." *Id.* at 1114.

As to Claim Two, the Complaint alleges that Defendant violated the unlawful prong of the UCL by failing to disclose its earnings credit arrangement, in violation of California Civil Code §§ 5375, 5375.5, and 5380 and in violation of California common law regarding breaches of contract and breaches of fiduciary duty. Compl. ¶¶ 44-46. As to Claim Four, the Complaint alleges that Defendant engaged in an unfair business practice by forming an earnings credit arrangement with the bank, knowingly failing to disclose material facts regarding its earnings credit arrangement and receipt of benefits, and failing to pass on those benefits to class members. *Id.* ¶¶ 56-61.

Ultimately, Plaintiff's UCL claims are based on the same underlying wrongs as its claim for breach of fiduciary duty, namely, Defendant's entering into, and failure to disclose, an earnings credit relationship with the bank. Thus, as discussed above, Plaintiff lacks standing to assert its UCL claims where Plaintiff asserts harm based on Defendant's earnings credit arrangement or its alleged nondisclosure thereof because Plaintiff cannot show either monetary injury or informational injury. *See McFerrin*, 2009 WL 2045212, at *7; *TransUnion*, 594 U.S. at 442.

Plaintiff also appears to argue on reply, although it is unclear, that it has standing because Plaintiff "was entitled to know about [Defendant]'s beneficial arrangements with third parties, including banks, under the common law of fiduciaries and California Civil Code section 5375.5(a)," and Defendant failed to adequately disclose its earnings credit arrangement. *See* Pl. Reply at 7-8; *see also* Compl. ¶ 45 (unlawful business practice in violation of California Civil Code § 5375.5). California Civil Code § 5375.5(a) provides,

> A common interest development manager or common interest development management firm shall disclose, in writing, any

> potential conflict of interest when presenting a bid for service to an association's board of directors. "Conflict of interest," for purposes of this section, means: (a) Any referral fee or other monetary benefit that could be derived from a business or company providing products or services to the association.

Plaintiff's argument is unavailing. "[A] bare procedural violation, divorced from any concrete harm" fails to satisfy Article III's injury-in-fact requirement. *Spokeo*, 578 U.S. at 341. "[A]n injury in law is not an injury in fact. Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 594 U.S. at 427. Thus, in other statutory contexts, district courts have held that "the sole assertion that an insufficient disclosure violated a plaintiff's . . . statutory rights is insufficient" to establish Article III standing. *Ellsworth v. Schneider Nat'l Carriers, Inc.*, 2021 WL 6102514, at *4 (C.D. Cal. Oct. 28, 2021) (denying certification of Fair Credit Reporting Act claims) (citation modified); *see also Env't Health Advocs. v. NutraSky, LLC*, 2026 WL 458143 (N.D. Cal. Feb. 18, 2026) (holding that plaintiff lacked Article III standing for failure to receive Proposition 65 warning where plaintiff failed to allege adverse effects from non-disclosure); *Atkinson v. Aaron's LLC*, 733 F. Supp. 3d 1056, 1070 (W.D. Wash. 2024) (dismissing claims based on salary-range disclosure statute because non-disclosure does not constitute injury in and of itself).

Here, Plaintiff has not met its burden to show standing through an alleged statutory violation. As discussed above, absent a concrete monetary or informational injury, Plaintiff cannot rely on a "bare procedural violation" of statutory law to support a finding that Plaintiff suffered an injury in fact. Plaintiff only cites *Truong v. KPC Healthcare, Inc.*, 2024 WL 1984569 (C.D. Cal. May 3, 2024) and *Public Citizen v. Department of Justice*, 491 U.S. 440 (1989) to support the conclusion that the deprivation of information required to be disclosed by statute can support a finding of informational injury. Pl. Reply at 8. Both cases are inapposite. In *Truong*, the court did not need to decide whether a "bare procedural injury" could establish standing because

the plaintiff had plausibly alleged that the defendant's "withholding of the requested valuation report in violation of ERISA prevent[ed] [the plaintiff] from fully understanding the benefits to which she is entitled under the [ERISA] plan." *Truong*, 2024 WL 1984569, at *8. Here, as discussed below, Plaintiff has not established a similar informational injury. And *Public Citizen* is distinguishable, as stated in *TransUnion*, because it "involved denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information." *TransUnion*, 594 U.S. at 441. But "[t]his case does not involve such a public-disclosure law." *Id.*

Accordingly, Plaintiff fails to establish an injury based on a violation of California Civil Code § 5375.5(a).

3. <u>Other Standing Arguments</u>

Having concluded that Plaintiff Riva lacks standing to pursue its breach of fiduciary duty and unfair competition claims, the Court declines to reach Defendant's second standing argument regarding causation and actual knowledge.

4. <u>Summary</u>

In summary, Plaintiff has not met its burden at class certification to establish standing for its breach of fiduciary duty and unfair competition claims by a preponderance of the evidence because Plaintiff has not presented evidence of a concrete injury resulting from either Defendant's earnings credit arrangement or Defendant's alleged failure to disclose the arrangement to Plaintiff and the class members.

Further, because Plaintiff lacks standing on the claims for which it seeks class certification, Plaintiff fails to meet the adequacy and typicality requirements to certify those claims under Rule 23(a). *See Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *14 (N.D. Cal. May 14, 2015) (holding that where plaintiffs "do not have standing to assert claims on behalf of the proposed class . . . . the typicality and adequacy requirements are not satisfied as to these Plaintiffs"); *Ruiz v. Shamrock Foods Co.*, 2018 WL 5099509, at *3 (C.D. Cal. Aug. 22, 2018) ("Without individual standing to raise a

legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class."), *aff'd*, 804 F. App'x 657 (9th Cir. 2020); *Salinas v. Nestle Purina Petcare Co.*, 2024 WL 1722301, at *12 (E.D. Cal. Apr. 19, 2024) ("If a court finds that standing is lacking, then adequacy will be as well, for a plaintiff cannot be an adequate representative for claims [ ]he does not have standing to pursue.") (quoting William B. Rubenstein, *Newberg on Class Actions* § 3:59 (5th ed. 2011)); *Jackson-Jones v. Epoch Everlasting Play, LLC*, 2026 WL 1206025, at *2 (C.D. Cal. Apr. 29, 2026) ("A named plaintiff's standing, or lack thereof, relates to adequacy of representation insofar as it has the potential to sever a plaintiff's interests from those of the class he seeks to represent.") (citation modified).

## IV. CONCLUSION

"Standing is the threshold issue in any suit. If the individual plaintiff lacks standing, the court need never reach the class action issue." *NEI*, 926 F.3d at 532 (quoting *Lierboe*, 350 F.3d at 1022); *Rivera v. Invitation Homes, Inc.*, 2022 WL 504161, at *5 (N.D. Cal. Feb. 18, 2022) (dismissal proper where the only named plaintiff lacks Article III standing). Because the Court concludes that Plaintiff fails to meet its burden at class certification to establish standing for its breach of fiduciary duty and unfair competition claims, and standing is a threshold issue, the Court declines to reach the remaining class certification issues.

Accordingly, the Court DENIES Plaintiff's motion for class certification and DISMISSES without prejudice Plaintiff's second cause of action (unfair competition claim based on unlawful business practice), third cause of action (breach of fiduciary duty), and fourth cause of action (unfair competition claim based on unfair business practice) with leave to amend. The Court grants leave to amend the Complaint to the extent Plaintiff can allege facts sufficient to show Article III standing. Plaintiff is not permitted to add any new claims.

At the August 11, 2026 hearing, Plaintiff stated that it would meet and confer with Defendant on whether to proceed with its first and fifth causes of action. Unless Plaintiff

timely amends its Complaint as provided below, this action will proceed solely on Plaintiff's first cause of action (breach of contract) and fifth cause of action (unjust enrichment) on an individual basis.

In conclusion, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for class certification (ECF No. 51) is DENIED without prejudice;
2. Plaintiff's second cause of action (unfair competition claim based on unlawful business practice) is DISMISSED with leave to amend;
3. Plaintiff's third cause of action (breach of fiduciary duty) is DISMISSED with leave to amend;
4. Plaintiff's fourth cause of action (unfair competition claim based on unfair business practice) is DISMISSED with leave to amend; and
5. Plaintiff is GRANTED LEAVE to file an amended complaint as provided above within thirty (30) days of this Order. If Plaintiff does not timely file an amended complaint, this action will proceed solely on Plaintiff's first cause of action (breach of contract) and fifth cause of action (unjust enrichment) on an individual, not class, basis.

Dated: August 27, 2026

CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

8, riva.2782.24