Michael F. Ram, SBN 104805
mram@forthepeople.com
Amalee Beattie, SBN 367585
amalee.beattie@forthepeople.com
Logan Graham, SBN 364573
logan.graham@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone: (415) 846-3862
Facsimile: (415) 358-6923

Jeffrey B. Cereghino, SBN 99480
jbc@cereghinolaw.com
CEREGHINO LAW GROUP LLP
737 Bryant Street
San Francisco, CA 94105
Telephone: (415) 433-4949
Facsimile: (415) 433-7311

*Attorneys for Plaintiff and the Putative Class*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIVA ON THE RIVER HOMEOWNERS ASSOCIATION on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE MANAGEMENT ASSOCIATION, INC. dba THE MANAGEMENT TRUST, a California Corporation, and DOES 1 through 200, inclusive,<br><br>Defendants. | No. 2:24-cv-02782-WBS-CSK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMAND |

Pursuant to Leave of Court granted in this Court's Order dated August 28, 2026, this Amended Complaint is filed by Plaintiff Riva on the River Homeowners Association, on their own behalf and on behalf of the Class of persons defined below, based on their personal knowledge as to the facts pertaining to themselves and their own acts and otherwise upon information and belief as to all other matters. Plaintiff and the Class allege as follows:

**INTRODUCTION**

1. Defendant, The Management Association, Inc. dba The Management Trust ("TMT") received payments from banks based solely on deposits belonging to Plaintiff and the Class in violation of its fiduciary duty as an agent and trustee, and various state statutes including California Civil Code section 5380(b)(5), which provides that "[n]o interest earned on funds in the account shall inure *directly or indirectly* to the benefit of the managing agent or the managing agent's employees" (emphasis added). As managing agent, The Management Trust (TMT) aggregated bank accounts of Plaintiff and other HOA's into a single master "earnings credits" agreement and was paid for the value of its clients' funds to the bank.

2. TMT and participating banks disguised the payments as compensation for "services" allegedly provided to the bank, while, in reality, these payments were interest that, by law, belonged to Plaintiffs and the Class and could not inure to TMT "directly or indirectly." Cal. Civ. Code § 5380(b)(5). TMT used a standard invoice throughout the class period which was created to avoid the scrutiny of bank regulators. The invoices sought payment from the bank to TMT for "services" Plaintiff and the Class contracted with TMT to perform, such as "bank reconciliations," and which were seldom, if ever, performed—and, if they were performed, were worth far less than the value of the payments from the banks to TMT. The payments TMT received were in excess of 35 million dollars during the class period.

3. TMT further violated its statutory, contractual, and fiduciary duties by failing adequately to disclose to Plaintiff and the Class that these bank payment deals existed at all, let alone that the so-called "earnings credits" should have been paid as interest to Plaintiff and the Class under Civil Code section 5389(b)(5). Because of TMT's nondisclosure, Plaintiff retained

TMT as its property manager and agent to its detriment. Because of TMT's secret payment deal, Riva's funds were held in an account with little to no interest rate. Had TMT disclosed the amounts that banks were paying it based on what should have been interest on Plaintiff's funds, Plaintiff would have insisted on receiving its share of the payments in the form of a higher interest rate or portion of the "earnings credits," or would not have contracted with TMT at all. Plaintiff learned of TMT's misconduct from its counsel, Deon Stein, within a year of filing its original complaint in this case.

## JURISDICTION

4. This Court has jurisdiction under 28 U.S.C. section 1332(d)(2) because (1) this is a class action with more than one hundred (100) Class Members; (2) The Management Trust is a California Corporation based in the State of California; (3) Plaintiff and all Class Members are domiciled in various states in the United States and (4) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

## VENUE

5. Venue in this Court is proper pursuant to 28 U.S.C. section 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District. In the alternative, venue in this Court is proper pursuant to 28 U.S.C. section 1391(a)(3) as TMT does sufficient business in this District to subject it to personal jurisdiction.

## PARTIES

6. Plaintiff, Riva on the River Homeowners Association ("Riva") is a non-profit mutual benefit corporation. Plaintiff is a common-interest development consisting of 252 condominiums and common areas located in West Sacramento, California. Plaintiff is responsible for preserving, maintaining, and managing the community's common areas and common facilities and, to the extent described in Plaintiff's governing documents, providing repair and maintenance services to individual lots and residences.

7. Defendant, The Management Trust, was and is a California corporation, under entity number C2810994, and has its principal place of business in Irvine, California. The

Management Trust maintains offices throughout California.

8. Plaintiff is ignorant of the true names and capacities of Defendants sued as Does 1 through 100, inclusive, ("Doe Defendants") and therefore sues these Doe Defendants by fictitious names. Plaintiff will amend their Complaint to allege the true names and capacities of these fictitiously named Doe Defendants when they are ascertained. Each of the fictitiously named Doe Defendants is responsible for the conduct alleged in this Complaint and Plaintiff's damages were actually and proximately caused by the conduct of the fictitiously named Doe Defendants.

9. Plaintiff is informed and believes, and on that basis alleges, that each of these Doe Defendants was the agent, joint venturer, and/or employee of Defendant and/or the Doe Defendants, and in doing the things alleged, were acting within the course and scope of the agency, joint venture, and employment with the advance knowledge, acquiescence, or subsequent ratification of Defendant and each and every other Doe Defendant.

## FACTUAL ALLEGATIONS

### Background on Community Associations

10. According to the Community Association Institute, more than 70 million people live in community associations in the United States. That number is expected to double by 2040. Annually, community associations collect $95.6 billion in community assessments with nearly $30 billion of that contributed to reserve accounts. Community association assessments, much like municipal property taxes, are compulsory assessments used exclusively to fund essential obligations, including professional management services, utility expenses, insurance, routine maintenance, and capital improvements.

11. Common interest developments (CIDs), also referred to as community associations, provide a communal basis for preserving, maintaining, and enhancing homes and property. All community associations have certain basic, defining characteristics. First, membership in a community association is mandatory and automatic for all homeowners within

the community. Certain legal documents (such as community bylaws) specify the mandatory terms and conditions to be observed by all homeowners that are members of the community association, as well as by the community association itself. These documents require mutual obligations to be performed by the individual homeowner and the community at large, acting through the community association. Mandatory lien-based economic charges or assessments are levied on each homeowner to operate and maintain the community association.

12. To manage their obligations and finances, community associations routinely retain management companies to perform or oversee the obligations and functions (executive and day-to-day operational) of the community association. Community associations are non-profit organizations that are governed by volunteer oversight boards (often with significant annual turnover) consisting of layperson homeowners that require the expertise of a professional third-party property management company. These property management companies are entrusted to handle, as agent, fiduciary, trustee, and custodian, the community association's day-to-day operations including managing the receivables from their constituent homeowners.

13. Community associations' liquid funds that are collected from member homeowners and other sources (*e.g.*, insurance proceeds) are used to pay the community association's operating expenses and other obligations. Applicable laws and regulations and/or the community association's governing documents (including Riva's) uniformly require association funds to be maintained only at an insured depository institution. Deposit accounts are opened by the property management company for the community association.

14. The deposit accounts fall into two categories: (i) operating accounts established for the maintenance of the community (*e.g.*, landscaping, insurance, labor, utilities, etc.) that the community manager uses to handle daily deposits and withdrawals of association operating funds ("operating accounts") and (ii) reserve accounts established for specific capital improvement expenditures (*e.g.*, roofs, roads, façades, elevators, etc.) for the holding of association reserve funds as required by an association's governing documents and applicable laws ("reserve accounts").

15. Pursuant to contractual agreements, management companies are typically charged with certain critical aspects of common interest developments' financial management, including but not limited to collecting, depositing, and tracking homeowner assessments; paying and managing vendors; establishing bank accounts with the management company as trustee; creating monthly financial reports regarding both dues collection and dues delinquencies; providing banking reconciliations; and providing property facilities management.

16. As part of the same management company's financial relationship with its client, the contract will provide that the client must place all funds into an FDIC insured bank of the management company's choosing, and further that the management company will be the trustee of said accounts.

17. Management companies have a common law fiduciary duty, statutory duty, and industry standard ethical duty to act in the best interests of their clients. That duty extends to disclosure of conflicts of interest.

**<u>The Effect of Regulation Q and the Dodd-Frank Act on Bank Payment of Interest on Checking Accounts</u>**

18. Regulation Q, issued by the Federal Reserve, prohibited banks from paying interest on demand deposits—commonly known as checking accounts. Enforced from 1933 until 2011, it was part of a broader effort to stabilize the banking system after the Great Depression. Prior to 2011 "earnings credits" from banks based on money in checking accounts could only reduce fees. They could not substitute for interest because earning interest on demand deposit accounts was illegal.

19. Demand deposits can be withdrawn "on demand" (e.g., via checks, debit cards, or electronic transfers). Unlike savings accounts or certificates of deposit ("CDs"), which often earn interest but have withdrawal restrictions, Regulation Q deemed demand deposits "non-interest-bearing" to prevent banks from competing aggressively for deposits through high interest rates.

20. While Regulation Q was in effect, banks created other means of rewarding large depositors to indirectly circumvent the prohibition on interest. One such means was the award of "earnings credits" to commercial customers—including community association management companies—which were applied against fees for normal banking services. According to a white paper produced by TMT entitled "5 Ways Property Management Companies Should Think About Earnings Credit Rate Programs," ("White Paper"), because of Regulation Q's prohibition on interest, "earnings credits" "could only be used to offset bank fees." (Ex. D at 2).

21. Under Regulation Q excess or unused "earnings credits" could also be paid to compensate for banking services provided by third party vendors through vendor contracts. According to TMT's expert, Cathleen Carmichael, in her paper entitled [redacted] (Ex. B at 16-17).

22. While Regulation Q was in effect, some courts found that "earnings credits" were not the property of bank customers because, at the time, banks were prohibited from paying interest and courts saw "earnings credits" as a form of illegal interest that should not have been paid to any entity at that time.

23. In 2011, section 627 of the Dodd-Frank Act repealed the prohibition of interest on demand deposits. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 627, 124 Stat. 1376, 1640 (2010) (codified at 12 U.S.C. 371a). This change was intended to increase competition among banks, leading to better interest rates for consumers; encourage innovation in banking products (e.g., high yield checking accounts); and align U.S. banking practices with global standards.

24. As TMT's expert Cathleen Carmichael noted, [redacted]

[redacted] (Ex. B at 16-17.)

25. According to the White Paper, during Regulation Q, banks offered "'earnings credit[s],' which could only be used to offset bank fees." However, after the Dodd-Frank repeal, banks began to "offer both credits to offset fees *and hard interest*." (Ex. D, at 2, emphasis added).

26. In a 2014 Private Letter decision, the Internal Revenue Service found that "earnings credits" which are not used to offset bank fees but are "earned in lieu of interest . . . [and] are used to pay for third party vendor for services result in interest income to the customer under section 61(a)(4)." And, because they "*give rise to interest income* under section 61(a)(4) [they are also] reportable under section 6049."[1]

27. The term "earnings credit rate" today means "*interest* used by banks on non-interest-bearing accounts to offset service charges."[2]

28. Now that the prohibition on interest payments to bank customers is no longer in effect, interest payments erroneously denominated as "earnings credits" must lawfully be awarded to homeowners' associations, such as Plaintiff, rather than to their managing agents, such as TMT. Cal. Civ. Code § 5380(b)(5). This common class-wide issue predominates this class action.

**<u>Interest in any form on HOA accounts belongs to HOAs</u>**

29. California Civil Code § 5380(b)(5) expressly provides that "No interest earned on funds in the account shall inure directly or indirectly to the benefit of the managing agent or the managing agent's employees."

30. California Civil Code 5380(e) provides that "The prevailing party in an action to enforce this section shall be entitled to recover reasonable attorney fees and court costs."

---

[1] Internal Revenue Service Number 201426002, Release Date: 6/27/2014, p. 6, available online at https://www.irs.gov/pub/irs-wd/201426002.pdf (emphasis added).

[2] Investopedia, https://www.investopedia.com/terms/e/ecr.asp, updated May 24, 2026, accessed September 21, 2026 (emphasis added)

31. Former California Civil Code 1363.2 (b)(5), the predecessor statute to §5380, mirror the precise language in 5380(b)(5).

32. Washington State Code §308-124E-115 (1)(a), regulating the administration of funds held in trust for property management, mandates that "All interest or earnings shall accrue to the owner."

33. Nevada State Chapter 116A.640 provides that a "community manager" shall not "Accept any compensation, gift or other item of material value as payment or consideration for a referral or in the furtherance of performance of his or her normal duties" unless that acceptance complies with all applicable laws and the client consents in writing to the community manager's acceptance of that benefit.

34. Under Cal. Civ. Code Section 5380, Washington State Code §308-124E-115 (1)(a), and Nevada State Chapter 116A.640(11), any and all interest earned on Riva's and Class Members' funds in bank accounts opened by TMT belonged to Riva and the Class. This includes "earnings credits" paid for the use of Riva's and Class Members funds. This money cannot inure "directly or indirectly" to an HOA management company such as TMT.

35. The Davis-Stirling Act does not define "interest." "Interest" is commonly defined as "a sum paid or charged for the use of money or for borrowing money."[3] California courts have used the Regulation Q definition of "interest," namely, "any payment to or for the account of any depositor as compensation for the use of funds constituting a deposit." *Hirsch v. Bank of Am.*, 107 Cal. App. 4th 708, 713 (2003).

**<u>Banks paid TMT what amounted to interest on TMT's clients' deposited funds</u>**

***A. TMT's Secret Profits from its Earnings Credit Kickback Scheme***

36. Beginning with the rise of large-scale HOA management companies in the 1990s and early 2000s—which began to oversee millions in dollars of HOA funds—banks began to compete to have those HOA funds deposited in their banks. As a result, banks began

[3] Dictionary.com, Interest, available at: https://www.dictionary.com/browse/interest, last accessed September 26, 2026.

to offer increasingly lucrative "perks" to incentivize HOA management companies to deposit client funds in trust accounts controlled by the management company as trustee.

37. TMT capitalized on the banks' desire to increase lucrative deposits and began negotiating agreements: TMT would deposit HOA funds in a bank, and in exchange, get paid. The first agreement TMT produced in discovery, which reflects the payments and source of the funds for those payments, was [redacted] (Exhibit A at 4). The proposed arrangement is detailed in the comparison spreadsheet reproduced below: [redacted]

38. [redacted]

[redacted]

[redacted]

41. [redacted]—the entity that has a fiduciary duty as a trustee to act in the best interests of its clients and to disclose any potential conflicts of interest.

42. [redacted]

[redacted]

[redacted]

[redacted]

46. Under a traditional "earnings credit" arrangement, these nearly sixty thousand dollars in "earnings credits" would only be used to offset any banking fees charged by a bank. However, because [redacted]

47. To recoup these remaining earnings credit dollars, TMT created a scheme where it would establish a separate, third-party entity that would be directly paid by [redacted] for all remaining earnings credit dollars for performing third-party banking "services."

48. However, [redacted]

49. TMT never performed the third-party banking services for [redacted] or other banks it entered into "earnings credits" kickback schemes with. Instead, TMT established a separate entity which sent false invoices to [redacted] and other banks for "banking services" that neither TMT nor its captive entity performed.

50. TMT never disclosed to Plaintiff that it was receiving [redacted] TMT never disclosed to Plaintiff that it had entered into a payment arrangement with [redacted] in exchange for depositing Plaintiff's and Class members' funds in Pacific Western Bank.

51. The funds [redacted] used to pay TMT came from its use of TMT's clients' funds.

52. In addition to [redacted] plaintiff is informed and believes that TMT also entered into "earnings credit" kickback schemes with other banks.

53. One of these other banks was [redacted]

54. [redacted]

55. [redacted] It reads:

[redacted]

56. [redacted]

57. [redacted]

58. At no time during the class period did TMT ever disclose to Plaintiff or the Class any of the payments or the source of these payments.

59. [redacted] and TMT was prohibited by statute and fiduciary duty requirements from accepting them.

60. TMT received payments, denominated as "earnings credits," because it controlled HOA money as a fiduciary agent. TMT concealed those benefits from its principals despite disclosure obligations, and retained profits generated by principal assets in violation of the law and without informed consent.

61. TMT negotiated several more contracts with [redacted]

62. [redacted]

### *B. TMT's Captive Third-Party Entity Which Sent False Invoices to Receive Direct Payments from Banks*

63. To be paid "earnings credits" from the banks it entered into "earnings credit" kickback schemes with, TMT established a captive entity, Lien & Accounting Services.

64. Lien & Accounting Services is created and wholly owned by TMT. Jenkins Dep. 11/05/25, 85:5-13. It is a hollow entity with no employees. Jenkins Dep. 05/07/26, 20:2-10.

65. TMT used Lien & Accounting Services during the class period to create false invoices to [redacted] and other banks that TMT entered into "earnings credit" deals with. These invoices were sent to the banks to funnel all excess "earnings credits" that were not offsetting banking fees to TMT.

66. Every month, TMT would send [redacted]—and other banks TMT entered into "earnings credit" kickback schemes with—an invoice that exactly matched the amount of remaining "earnings credits."

67. The invoices that TMT sent (through Lien & Accounting Services) did not reflect any actual service TMT or Lien & Accounting Services was providing to the bank. Instead, as TMT's Chief Financial Officer Alan Jenkins described in a deposition, these invoices were sent to pass "muster" with regulators. Jenkins Dep. 05/07/26, 55:9-15. The invoices disguised the direct payments TMT was getting every month for depositing HOA client funds in select banks.

### *C. The "Earnings Credit" Kickback Scheme in Practice*

68. [redacted]

69. [redacted]

[redacted]

70. [redacted]

[redacted]

[redacted]

71. [redacted]

72. [redacted]

73. [redacted]

[redacted]

74. [redacted]

75. [redacted]

76. [redacted]

[redacted]

77. [redacted]

78. [redacted]

79. [redacted]

80. TMT never disclosed to Plaintiff or the class members that [redacted]

81. [redacted]

82. [redacted]

83. Invoices and account analysis statements for TMT's other subsidiary management companies and from other banks TMT had an earnings credit arrangement with can be further used to ascertain damages.

**Statutory Conflict of Interest Disclosure Requirements**

84. In addition to violating California Civil Code Section 5380, TMT violated California Civil Code Section 5375 by failing to disclose its payment deals.

85. California Civil Code § 5375 (d) states that a management company must "Disclose any business or company in which the common interest development manager or common interest development management firm has any ownership interests, profit-sharing arrangements, or other monetary incentives provided to the management firm or managing agent."

86. California Civil Code § 5375.5 states that: "A common interest development manager or common interest development management firm shall disclose, in writing, any potential conflict of interest when presenting a bid for service to an association's board of directors. 'Conflict of interest,' for purposes of this section, means:

(a) Any referral fee or other monetary benefit that could be derived from a business or company providing products or services to the association.

(b) Any ownership interests or profit-sharing arrangements with service providers recommended to, or used by, the association."

87. Other states mirror this statute. Nevada Rev. Stat § 116A.610 provides that a management company must disclose:

> 1. Whether the community manager, or any member of his or her organization, expects to receive any direct or indirect compensation, gifts, or profits from any person who will perform services for the client and, if so, the identity of the person and the nature of the services rendered.
>
> 2. Any affiliation with or financial interest in any person or business who furnishes any goods or services to the client.
>
> 3. Any pecuniary relationships with any unit's owner, member of the executive board, or officer of the client."

88. Oregon Revised Statutes Section 125.221 (7, 8) provides:

> (7) A fiduciary has a pecuniary or financial interest in another person for the purposes of this section if the fiduciary, or any person related to, employed by or affiliated with

> the fiduciary, receives remuneration or any other financial benefit from the person, without regard to whether that remuneration or benefit is directly tied to the services provided to the fiduciary or protected person.
>
> (8) In addition to the grounds specified in subsections (6) and (7) of this section, a fiduciary has a pecuniary or financial interest in another person for the purposes of this section if the relationship between the fiduciary and other person is such that the relationship could compromise or otherwise affect decisions made by the fiduciary in carrying out the duties of the fiduciary.

89. Washington Revised Cde 11.98.078 provides:

> (1) A trustee must administer the trust solely in the interests of the beneficiaries.
> (2) Subject to the rights of persons dealing with or assisting the trustee as provided in RCW 11.98.105, a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction unless: [five enumerated statutory requirements are satisfied, including consent by trust beneficiary]."
>
> In addition to the provisions set out in RCW 11.98.078, if a conflict of interest may reasonably be expected to have a material adverse impact on the trustee's judgment in its provision of services to such client, the trustee must provide a reasonable disclosure of such conflict to such client.

90. Washington Revised Code 30B.24.020 further provides:

> In addition to the provisions set out in RCW 11.98.078, if a conflict of interest may reasonably be expected to have a material adverse impact on the trustee's judgment in its provision of services to such client, the trustee must provide a reasonable disclosure of such conflict to such client.

91. The obligation to disclose conflicts of interest is further codified in California Business and Professions Code Section 11504 (f) which states: "A common interest development manager or common interest development management firm *shall* disclose information required by Section 5375 of the Civil Code." (emphasis added).

92. The legislative history of AB 690, which resulted in adding the disclosure requirement, shows that one purpose of the bill was to ensure HOAs had relevant information about managers' relationships before contracting with a manager:

> "This bill will help HOA owners prepare for costs associated with the transfer of real property and to *assure that the HOA board has the tools necessary to make informed decisions regarding proposed service providers by requiring these companies to disclose any financial/monetary benefits they will receive in exchange for recommending a service provider*." Senate Judiciary Committee Report, June 27, 2017, 2017 California Assembly Bill No. 690, California 2017-2018 Regular Session, at 4 (emphasis added).[4]

93. The Senate Judiciary Committee comments on AB 690 are instructive as the legislative concerns that gave rise to this bill. The legislature commented that:

> "CID's have regular expenses for maintenance, repair, and improvement of the common facilities. For example, if the CID has a swimming pool in a common area, the CID will need to pay for regular servicing of the pool as well as any maintenance or repair needed. Similarly, if the CID is having trouble getting homeowners to pay their assessments, the CID may employ a collection agency to help it go after the money owned. Many times, the property manager is responsible for procuring services such as these or obtaining bids that will be presented to the association board for consideration. In either scenario, *property managers can subtly gain from the transaction if the property managers have an ownership interest in the business that receives the contract (self-dealing) or if the property managers steer the contract to a particular company in exchange for side payments (kickbacks)*." *Id.* at 5 (emphasis added).

94. The concerns expressed by the legislature are at the core of this case. TMT entered into secret agreements with banks to deposit their clients' funds and receive millions of dollars in payment.

95. Throughout the class period, TMT has violated the above statutes by failing to disclose its deals with banks to deposit TMT's clients' funds into said banks in order to receive financial benefits derived from the clients' funds.

96. TMT kept its banking relationship secret not just from Plaintiff and the Class, but from its own senior executives. Only two TMT executives knew about these deals, the CEO and CFO. (Alan Jenkins Depo, 11/5/25, 76:24-78:7). Senior TMT employees, beyond the CEO and CFO, noted that they had never even heard of Lien & Accounting Services or that, via it,

---

[4] Available at: https://1.next.westlaw.com/Link/Document/Blob/Ia80ef6805bc411e7a350c0dab8a1e185.pdf?targetType=pending-pdf&originationContext=document&transitionType=DocumentImage&uniqueId=0a0dfd42-c881-47d7-88ef-51067dc6ad65&ppcid=ff292e50c725482495ff5a975fe92141&contextData=(sc.RelatedInfo

TMT sent invoices to banks. (Hofmann Depo., 06/16/26, 85:8-19.) TMT never told a single client about these deals, and no client ever advised TMT that they learned of these deals.

97. TMT contends that it was providing "services" to the participating banks in exchange for payments of almost one million dollars a month, and that its clients benefited from this arrangement. Neither contention is true. As elaborated above, TMT provided no compensable services to any bank.

**<u>Community Association Managers' Standards of Professional Conduct</u>**

98. Community Association Managers are governed by standards of professional Conduct which reflect the statutory regulations. The Community Association Managers International Certification Board (CAMICB) publishes Standards of Professional Conduct governing Certified Managers of Community Associations (CMCA)—attached as Exhibit K—which provide that a CMCA shall, *inter alia*:

a. "Promptly disclose to Client Association(s) any actual or potential conflicts of interest that may involve the manager…. *Disclosure of any possible conflict of interest is the key factor*. For example, a manager (individually or through a company) may have a financial interest or contractual arrangement with a service contractor, supplier, or professional firm that is being considered by that manager's client. *The disclosure must be made in writing to the association before the selection process to allow the client to consider the possible conflict fully and any alternatives*. The fact that the client may still choose the manager's related entity is not a violation of the Standards, *provided ample disclosure was given*." Exhibit K at 1, 3.

b. "Refuse to accept any form of gratuity, compensation, or other remuneration from individuals or companies that may improperly influence the manager's decisions…. *CAMICB requires managers to provide written disclosure to the client of any compensation, gratuity, or other forms of remuneration to the manager from individuals or companies who act or may act on behalf of the client*.." *Id.*

c. "Uphold their fiduciary duty to the Client Association(s) by acting with due diligence, loyalty, and care in all aspects of community management…. A breach of fiduciary duty includes any failure to act in the association's best interests, such as mismanaging association funds or neglecting critical responsibilities that harm the association." *Id.* (emphasis added).

99. The Community Associations Institute (CAI) Professional Manager Code of Ethics—attached as Exhibit J—provides that the Manager shall *inter alia*:

a. "Act in the best interests of the Client; refrain from making inaccurate or misleading representations or statements; not knowingly misrepresent facts to benefit the Manager… *The Manager has a fiduciary duty/responsibility to the Client and should always act in the best interests of the Client. Managers should avoid exaggeration, misrepresentation, concealment, and knowingly distributing misinformation*." Ex. J at 1, 4 (emphasis added)
b. "*Disclose all relationships in writing to the Client regarding any actual, potential, or perceived conflict of interest affecting any relationship between the manager and the Client. The Manager shall take all necessary steps to avoid any perception of favoritism or impropriety during the vendor selection process and negotiation of any contracts*." *Id*. at 1 (emphasis added).
c. "*Provide prompt written disclosure to the client* of any compensation, gratuity, or other form of remuneration from individuals or companies who act or may act on behalf of the Client…. Provide disclosure to the management company executive and Client of any compensation, gratuity, or other form of remuneration from individuals or companies who act or may act on behalf of the Client valued in excess of $1,000 annually. *Disclosure to the client shall be made prior to the Client engaging the business partner who provides renumeration*." *Id*. at 1, 5 (emphasis added).

100. The California Association of Community Managers (CAACM) publishes a Code of Professional Ethics and Standards of Practice—attached as Exhibit L—which states, in relevant part, as follows:

a. "The Member shall act with loyalty, fidelity and integrity in all aspects of the Member's relationship with the client and in all aspects of representing client to third parties." Ex L at 6.
b. "The Member shall act as a fiduciary on behalf of the client in handling the client's financial affairs and shall put the client's interests above the Member's own in handling the client's financial affairs." *Id*. at 8.
c. "Members shall avoid any real or apparent conflicts of interest with the clients/employer. In the event of a real or apparent conflict of interest, the *Member shall promptly disclose all pertinent information* regarding the conflict to the client and allow the client to make an informed decision as to whether to continue the relationship on the then existing basis or to make an appropriate change in the relationship to accommodate the conflict. *The decision on how to deal with a real conflict of interest shall rest with the client and not with the Member. Recommendations* to a client of vendors, suppliers or contractors that have any financial or other than independent third party relationship to the Member, or a family relation or employee of the Member, *must be disclosed to the client by the Member at the time the recommendation is made*." *Id*. at 11 (emphasis added)
d. "The Member may provide goods or services to clients, other than community association management services, receive referral fees, and participate in fee/revenue sharing with other providers of goods and services *provided that there is full written disclosure by the Member to the Client as to all aspects that may*

*influence the Client's decision to enter into the contract*. The disclosure shall specifically include any payment to made or already paid directly to the Members as a result of contracting for these goods and services. This disclosure must be made at the time the recommendation is made, prior to the award of any contract to provide such goods and services and for each bid/contract/relationship. Disclosure must be repeated by the Member to the Client at the time the contract is executed." *Id*. (emphasis added)

e. "The Member is *prohibited from receiving undisclosed referral fees, deferred compensation, commissions or similar gratuities* in cash or in kind for recommending to or purchasing material or services on behalf of client. The acceptance of any gratuity *shall be fully disclosed* to all clients which have procured services from the providing person or business and to all clients who contemplate the procurement of such services." *Id*. at 12 (emphasis added).

101. Cathleen Carmichael, an expert for TMT in this matter, was deposed on May 21, 2026.

102. Carmichael serves on CAI's Designations Ethics Committee and, as part of that role, reads and updates the Professional Community Association Manager Code of Ethics, which applies to all persons holding CAI designations and/or accreditations. Carmichael Dep., 05/21/26 at 50-51, 124-125, 127.

103. Carmichael utilizes the CAI Professional Manager Code of Ethics to determine whether a violation of the code of conduct or code of ethics has occurred. Carmichael Dep., 05/21/26 at 126-127.

104. Carmichael testified that CAI credentialed and non-credentialed management companies should follow the CAI Professional Manager Code of Ethics Standards; those standards establish a minimum standard of professional ethical performance. Carmichael Dep. 05/21/26 at 128, 130.

105. Carmichael agreed with the CAI Professional Manager Code of Ethics that the manager has a fiduciary duty to the client. Carmichael Dep., 05/21/26 at 132.

**<u>TMT's expert Cathleen Carmichael Identifies the Ethical Dilemma TMT Exploited</u>**

106. In addition to testimony highlighted above, Cathleen Carmichael testified, in relevant part, as follows:

a. The CAI Professional Manager Code of Ethics requires management company executives to "[p]rovide annual disclosure (or upon execution of a new management agreement) all relationships with business partners or referral partners who the association is required to do business with under the management agreement for which the management company earns a commission, credit, payment, rebate, or other benefit."

b. The CAI Professional Manager Code of Ethics are a "minimum standard of professional ethical performance for those individuals and companies who receive recognition or designations from CAI."

c. The CAI Professional Manager Code of Ethics requires a manager to, among other things:

   i. "[d]isclose all relationships in writing to the Client regarding any actual, potential, or perceived conflict of interest affecting any relationship between the manager and the Client."

   ii. "take all necessary steps to avoid any perception of favoritism or impropriety during the vendor selection process and negotiation of any contracts."

   iii. "[p]rovide prior written disclosure to the client of any compensation, gratuity, or other form of remuneration from individuals or companies who act or may act on behalf of the Client."

d. Carmichael testified that a management company should provide prior written disclosure to the client of any compensation, gratuity, or other form of remuneration from individuals or companies who act or may act on behalf of the client. Carmichel Dep., 05/21/26 at 130.

e. Carmichael testified that some banks calculate the earnings credit formula based only on non-interest-bearing checking accounts, and some banks have a reduced

earning credit amount based on interest bearing accounts so that the net result to the bank is the same. Carmichael Dep., 05/21/26 at 113-114.

f. Carmichael testified that in California banking relationships should be disclosed to HOA boards before contracting and that the California disclosures rules would require disclosure to Riva of TMT's banking relationship. Carmichael Dep., 05/21/26 at 119-120.

g. Carmichael testified that she was not aware of any written notice between TMT and Riva that used the words "earnings credits" or "analyzed banking", that she was not aware of any statements from a bank paying TMT "earnings credits" that was sent to Riva, that she was not aware of any documents from a bank paying "earnings credits" to TMT that was sent to a homeowners' association under contract to TMT, and that she was not aware of any documents where TMT bid out banking services specific to Riva. Carmichael Dep., 05/21/26 at 96-97, 105.

h. Carmichael testified that she wrote a "college paper" discussing "earnings credits", analyzed banking, and disclosures regarding the banking relationship between banks and management companies. The paper discusses that disclosure is appropriate where disclosure is statutorily required or where the manager holds a credential which binds them by the Professional Manager Code of Ethics. Carmichael Dep., 05/21/26 at 74-75.

107. On August 25, 2026, after the conclusion of Carmichael's deposition, TMT produced the [redacted]

108. [redacted]

[redacted]

[redacted]

**TMT Failed to Adequately Disclose its Payment Deals**

109. TMT utilized an alleged "disclosure" that was uniformly employed and communicated to class members during the class period. This document was part of the management contract. TMT submitted this document as evidence to its opposition to class

certification. *See* Declaration of Alan Jenkins in Support of Defendant's Opp. to Plaintiff's Mtn. for Class Cert, 04/21/26, Ex. A. The disclosure discusses not TMT, but TMT's shell entity, Lien and Accounting Services. The disclosure states:

> "Lien & Accounting Services, a California LLC. Lien & Accounting is a regulation Q *approved provider of such banking services as lock box processing, EFT processing, reconciliation processing and credit card services among others. Lien & Accounting is paid directly by the banks and management firms for which it provides such services. Lien & Accounting, under the fictitious business name CID Support Services, also provides print-shop, binding and mailing services to management firms and community associations."*

110. The forgoing disclosure is misleading and false. It does not disclose that Lien and Accounting is wholly owned by TMT. It does not disclose that TMT receives all of the payments made to Lien and Accounting. It does not disclose that TMT is profiting from the interest arising from bank accounts and funneling excess earnings credit dollars to itself.

111. The disclosure falsely states that Lien and Accounting services provides services to banks and is paid for those services. As discussed above, Lien and Accounting was a hollow vehicle used to create false invoices to banks.

112. Neither Lien and Accounting Services nor TMT ever invoiced any bank for lock box processing, EFT processing, or credit card services.

113. Neither Lien and Accounting Services nor TMT ever created any schedule of fees for lock box processing, EFT processing, or credit card services.

114. Neither Lien and Accounting Services nor TMT ever produced any evidence that it actually provided any lock box processing, EFT processing, reconciliation processing, or credit card services for any bank during the class period. TMT's senior executives admitted no records existed of any such services being provided to any bank during the class period. (Jenkins Dep., 05/07/2026, 37:7-40:1-4, 43:11-47:5; Sasser Dep., 05/19/26, 49:20-50:4)

115. In violation of California law and the industry's own ethical standards, TMT failed to adequately disclose its payment deals with banks, instead disguising its deal in Regulation Q-era language about a third-party vendor and fictitious services.

**Riva's Banking History and TMT's Movement of Riva's Operating Funds**

116. Prior to retaining TMT as their management company, Riva had roughly [redacted] of its operating cash in a [redacted] which paid an interest rate of [redacted] Riva would earn approximately [redacted] a month in operating interest from this [redacted] account.

117. In approximately June of 2010, TMT transferred Riva's operating funds into a [redacted] account. [redacted]

118. By approximately February of 2012, Riva's operating funds were no longer being invested [redacted] The entirety of Riva's funds were held in a [redacted]. This remained the case for the remainder of the time that Riva retained TMT as its management company (through the end of 2018).

119. To get access to a bank which paid TMT earnings credits, TMT moved Riva's operating funds from [redacted] accounts which paid interest to Riva to a [redacted] which did not pay any interest to Riva.

120. At no time did TMT ever obtain [redacted] Exhibit C ¶3.5 at 6; Exhibit N, ¶5.1 at 9.

**Plaintiff Riva's Agreements with TMT and Injury**

121. Plaintiff, is a non-profit mutual benefit corporation. Plaintiff is a common interest development consisting of 252 condominiums and common areas and located in West Sacramento, California. Plaintiff is also a CID or community association for the purposes of the Davis-Stirling Common Interest Development Act (Cal. Civ. Code section 4000 *et seq.*). *See Retzloff v. Moulton Parkway Residents' Ass'n., No. One*, 14 Cal. App. 5th 742, 748 (2017) (The Davis-Stirling Common Interest Development Act "governs homeowners associations[]" . . . [and] "consolidated the statutory law governing condominiums and other common interest

developments." (internal quotations and citation omitted)).

122. Plaintiff retained The Management Trust and is informed and believes that this retention began on or about December 2, 2009, by entering into a Community Association Management Agreement "("Agreement").[5] Exhibit N. This Agreement renewed each year and was ultimately terminated by Plaintiff in late 2018.

123. Pursuant to the Agreement, [redacted] Exhibit N; *See also* exhibit C.

124. Under the Agreement, [redacted] Exhibit N; Exhibit C.

125. The parties' Agreement [redacted]

126. Plaintiff accepted and executed a second management contract on or about August

[5] The Agreement includes a confidentiality provision prohibiting any part of the agreement from, among other things, being distributed to anyone other than the parties to the Agreement. While Plaintiff disputes its validity, Plaintiff will attach all agreements with TMT under seal.

1, 2015. [redacted]

127. [redacted] *See* Exhibit C.

128. Because of TMT's "earnings credit" kickback scheme with banks, Plaintiff was injured.

### *A. Plaintiff Was Deprived of Interest on its Money*

129. To recoup excess "earnings credits" which remained after banking fees were offset, TMT sent fabricated invoices to banks for "services" it never performed.

130. The excess "earnings credits" that TMT was paid directly constitute hard interest which should have been paid to Plaintiff and class members. At the very least, these payments were interest that inured indirectly to TMT. Cal.Civ.Code § 5380(b)(5).

131. Had TMT had not been receiving hundreds of thousands of dollars in remaining "earnings credits" each month, Plaintiff's and class members' funds could have been placed into different accounts that could have paid Plaintiffs and class members interest such as 1) hybrid demand deposit accounts, 2) sweep accounts, 3) liquid certificates of deposits, or 4) into client's reserve funds which gain interest or can be invested.

132. For example, Plaintiff's and class members' funds could have been placed into a hybrid demand deposit account. These accounts offset all banking fees with "earnings credits," but then pay interest on any remaining net available balance. By doing so, these hybrid demand deposit accounts "provides compensation for every dollar in the account by combining Earning Credits used to offset service charges with interest applied to any remaining net available balance."[6]

133. Hybrid demand deposit accounts were first created in 2011 in response to the

---

[6] HSBC, Hybrid Checking Account, https://www.business.us.hsbc.com/en/products/hybrid-checking-account, last accessed: September 26, 2026.

passage of the Dodd-Frank act which ended Regulation Q's prohibition of interest being paid on demand deposit accounts. Hybrid demand deposit accounts were present during the entirety of the class period.

134. [redacted] one of the banks TMT entered into an "earnings credit" kickback scheme with and deposited HOA client funds at, offers a hybrid demand deposit account which allows clients to "earn interest on excess balance once [earnings credits] balances offset service charges."[7]

135. If Plaintiff's and class members' funds were placed in a hybrid demand deposit account, Plaintiffs and class members would have received, as interest, the excess "earnings credits" that TMT invoiced for.

136. Plaintiff and class members could have also had their money deposited in sweep accounts. Sweep accounts are a type of demand deposit account which "automatically reallocates surplus funds from primary operating accounts to higher-yield investment vehicles."[8] In other words, Plaintiff and class members could have had any excess funds which were not offsetting banking gees reallocated into "higher-yield investment vehicles" and earned interest on this money.

137. [redacted] one of the banks TMT entered into an "earnings credit" kickback scheme with and deposited HOA client funds at, offered a sweep account.[9]

138. If Plaintiff's and class members' funds were placed in sweep account, Plaintiffs and class members would have received, as interest, the excess "earnings credits" that TMT invoiced for.

139. Just like Riva's banking situation was before TMT was retained as their

---

[7] [redacted]

[8] J.P. Morgan, Optimize your cash management with sweep accounts, available at: https://www.jpmorgan.com/insights/treasury/liquidity-management/sweep-accounts-how-they-work-and-their-benefits-for-businesses, last accessed: September 26, 2026.

[9] [redacted]

management company, Plaintiff and class members could have also had excess deposited in Liquid or Certificate of Deposits. Liquid Certificate of Deposits give clients "fixed, guaranteed rate of interest for a specific term, but unlike standard CDs, you don't pay a penalty if you withdraw the funds before the maturity date."[10]

140. If Plaintiff's and class members' funds were placed liquid certificate of deposit or other type of CD, Plaintiffs and class members would have received, as interest, the excess "earnings credits" that TMT invoiced for.

141. Finally, Plaintiff and class members could have had funds that were not being used to offset banking fees placed into other investment bearing accounts, such as reserve accounts or investment accounts, that would pay them interest.

142. Pursuant to its undisclosed bank deals, TMT was paid more both for the larger amount and the longer Plaintiff's funds remained in operating accounts. TMT breached its fiduciary duty to Plaintiff by not putting excess funds that did not offset banking fees into any number of account that could have earned interest.

### ***B. Plaintiff Suffered Further Articulable Damages***

143. Not only were Plaintiff and class members deprived of interest on their money, but Plaintiff was also charged for banking services that TMT was invoicing banks for. Plaintiff paid a management fee to TMT, to, among other things, prepare monthly financial statements and bank reconciliations as part of those statements. TMT also "invoiced" the participating banks for the precise same tasks. TMT never disclosed that it was invoicing banks for these same services. Plaintiff is informed and believes, based upon TMT's own invoices that Plaintiff and the class members overpaid TMT by approximately $1200 per year, or almost $12,000 during the time period TMT was the manager. *See* Exhibits H and I.

144. At no time did The Management Trust, despite its role as a fiduciary and agent to Plaintiff and the Class, disclose to Plaintiff its arrangement with the bank to use Plaintiff's

[10] SoFi Learn, Guide to Liqued Certificates of Deposit (CDs), available at: https://www.sofi.com/learn/content/what-is-a-liquid-certificate-of-deposit/, last accessed: September 26, 2026.

deposited funds to collect payments from any bank based solely on the amount of deposited trust account funds.

145. As a fiduciary, and pursuant to state statutes, TMT had a duty to disclose its banking arrangements, not keep them secret.

146. None of Riva's board members was aware that TMT was receiving payments from banks, or that any previous property manager they retained had possibly received payments from banks, until February 2024. Bailey Dep., 03/12/26 at 48:7-11.

147. Kathy Bailey served on Riva's board from August 2019 to September 2019 and has been serving again from 2020 to the present. Bailey Dep., 03/12/26 at 17:8-13.

148. Ms. Bailey testified that during the time she was on Riva's board, she had never seen any agreement with any bank that disclosed fees banks might be paying to property managers. Bailey Dep., 03/12/26 at 216:12-17.

149. Ms. Bailey testified that once the board became aware that TMT had received "earnings credits," it asked its current management company whether it was also receiving "earnings credits." Bailey Dep., 03/12/26 at 52:3-16.

150. Ms. Bailey testified that, to her knowledge, Riva's current property manager does not receive "earnings credits." Bailey Dep., 03/12/26 at 52:6-16.

151. Plaintiff believes that Plaintiff's present bank does not charge any banking fees except for bounced checks.

152. Ms. Bailey testified that the board asked their current manager whether it received payments from banks "[b]ecause they were our management company at the time, and if they were doing it, we would cancel – we would drop them." Bailey Dep., 03/12/26 at 56:20-22.

153. Debra McGregor served on Riva's Board of Directors from September 2022 to September 2025. McGregor Dep., 03/04/26 at 17:4-6.

154. Ms. McGregor testified that during her time on Riva's Board the subject of property management companies receiving fees from banks never came up "[b]ecause we

didn't know it was a thing," and that during the Board's interviews of prospective managers, none of the prospective managers ever mentioned that they might be receiving fees from banks. McGregor Dep., 03/04/26 at 48:15-18; 63:4-14.

155. Denise Quenell has served on Riva's Board of Directors from 2007 to the present. Quenell Dep., 04/13/26 at 16:9-14.

156. Ms. Quenell testified they the subject of prior property management companies receiving fees from banks has yet to come up in board meetings. Quenell Dep., 04/13/26 at 80:3-8.

157. Ms. Quenell testified that if Riva's current board was receiving funds from banks, she believed Ms. Bailey "would do something about it." Quenell Dep., 04/13/26 at 81:2-12.

158. Ms. Bailey testified that Riva fired both Action and Silvercreek because they were "dishonest." Bailey Dep., 03/12/26 at 59:10-12.

159. Ms. McGregor testified that one of the reasons Riva fired Silvercreek was that Silvercreek was not "paying [Riva's] bills." McGregor Dep., 03/04/26 at 59:4-19.

160. Ms. Quenell testified that Riva fired TMT for numerous dishonesty issues that came to light, including a manager forging Ms. Quenell's signature. Quenell Dep. 04/13/26 86:21.

161. Riva's decisions to end management contracts due to dishonesty suggests that had Riva known that Action, Silvercreek, or TMT were receiving "earnings credits," Riva would not have contracted with any of them.

162. Had the Riva Board known about TMT's "earnings credits" deal, it would have negotiated differently, and either the parties would have reached an agreement that was more mutually beneficial, or Riva would have refused to hire TMT.

163. Due to TMT's non-disclosure of its "earnings credits" deal, Riva and class members were deprived of higher interest rates without their knowledge. They had no details of the elements of the invoices TMT sent to [redacted] (nor

were these invoices ever made available to them). Had they known they could have, armed with this knowledge, asked questions, such as why they were paying for reports like financial statements that were also invoiced to the banks. They were also deprived of the ability to negotiate a share of the bank payments, or request excess operating funds be placed in a financial account which would have paid interest to them.

164. Negotiating a share of bank payments is not a speculative damage or unlikely hypothetical. Plaintiff is informed and believes that two homeowner associations in Southern California, not managed by TMT, found out that their management company was being paid cash payments for excess earnings credits. These two HOA's demanded a share of the payments and received a share, according to senior banking executive who testified.

165. Furthermore, TMT's CFO, Alan Jenkins, admitted in his testimony that TMT could have shared payments with Plaintiff. Jenkins Dep., 05/07/2026 at 93:24-94:10.

166. Pursuant to statutes all of the "earnings credit" interest paid to TMT generated by the Bank's use of these funds belong to Plaintiff and the Class, not TMT.

167. [redacted]

168. [redacted]

169. [redacted]

170. [redacted]

171. [redacted]

172. [redacted]

173. [redacted]

174. [redacted] *Id*.

175. Like all HOAs, Riva hired TMT for its superior knowledge and expected TMT to act in Riva's best interest as its agent and fiduciary.

176. TMT's nondisclosure of the "earnings credits" compounded the preexisting informational asymmetry between TMT and Riva's board.

177. The alignment of the bank's interest (in getting HOA business) and TMT's self-interest (to increase its own profits rather than the HOA's returns), coupled with TMT's awareness of its superior knowledge of HOA banking, incentivized TMT to breach its fiduciary and ethical duty and hide that breach from Riva.

178. Riva's board reasonably assumed that TMT was fulfilling its fiduciary duties, including disclosing relevant monetary benefits it received and getting Riva the best interest rates available (Bailey Dep., 03/12/26 at 214:25-215:4 ("Q: So were you guys relying on the property management companies to keep track of interest rates that Riva was earning on its bank accounts? A: Correct.").

179. TMT elected to enter into an "earnings credits" deal with the bank rather than pursue higher interest rates for Riva.

180. Had TMT adequately disclosed that Riva faced a tradeoff between "earnings credits" and higher interest rates, Riva would have advocated for a higher interest rate rather than incentives that primarily benefitted TMT.

181. Had TMT refused to negotiate on the "earnings credits" deal, Riva would not have retained TMT as its manager. Riva would have retained a different management company that would have placed Riva's operating funds in bank accounts that would have paid Riva interest on excess funds that didn't offset banking's fees, or who would have shared the earnings credit kickback payments they were receiving with Riva.

182. TMT's failure to disclose its "earnings credits" deal produced downstream impacts that affected Plaintiff's contracts, banking choices, and resource allocation.

183. TMT's failure to disclose material, statutorily required information deprived Plaintiff of the ability to make a fully informed decision about entering into a management agreement with TMT.

## CLASS ACTION ALLEGATIONS

184. Plaintiff brings this action as a class action pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of itself and the class. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements as set forth in Rule 23(a) and Rule 23(b)(3).

185. Plaintiff advances this action on behalf of the following Class and Subclass:

**Class**

> All common interest developments (CIDs) or co-ops in the United States that engaged The Management Trust to manage their CID/co-op from January 1, 2012 to present. Excluded from the Class is The Management Trust, its legal representatives, assigns and successors and any entity in which The Management Trust has a controlling interest. Also excluded are any entities whom any of the Plaintiff's counsel is currently suing on behalf of a client, the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

**Subclass**

> All common interest developments (CIDs) or co-ops in the State of California that engaged The Management Trust to manage their CID/co-op from January 1, 2012 to present. Excluded from the Class is The Management Trust, its legal representatives, assigns and successors and any entity in which The Management Trust has

a controlling interest. Also excluded are any entities whom any of the Plaintiff's counsel is currently suing on behalf of a client, the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

186. Numerosity (Rule 23(a)(1)). Plaintiff is informed and believes that the Class is comprised of approximately 1,500 common interest developments and community associations in Washington, Oregon, California, Nevada, Arizona, Colorado, and Texas, making joinder impractical. The disposition of the claims of these Class Members in a single class action will provide substantial benefits to all parties and to the Court.

187. Commonality (Rule 23(a)(2)). There exist questions of law and fact common to all Class Members. Common questions include, but are not limited to:

a. Whether The Management Trust's agreements with the Plaintiff and the Class failed to disclose "earnings credits" it receives from banks;

b. Whether The Management Trust was required to disclose "earnings credits" it receives from banks;

c. Whether The Management Trust had an undisclosed business relationship with banks and received undisclosed financial incentives from the banks to deposit Plaintiff's and the Class Members' funds into the banks.

d. Whether The Management Trust failed to disclose to Plaintiff and Class Members that it was paid significant funds based upon interest earned from deposits belonging to the Plaintiff and Class;

e. Whether The Management Trust doubled billed for monthly financial statements and bank reconciliations by billing banks and charging Plaintiff and the Class for these same services;

f. Whether The Management Trust failed to share the "earnings credit" kickback payments it received on client funds with Plaintiff and the Class;

g. Whether The Management Trust created false invoices for work never performed for or delivered to Bank;

h. Whether those invoices were used to conceal the true source of bank payments;

i. Whether The Management Trust violated the unlawful prong of California Business and Professions Code section 17200;

j. Whether The Management Trust violated the unfair prong of California Business and Professions Code section 17200 by receiving bank payments predicated, either directly or indirectly, from interest earned on the Plaintiff's and Class bank deposits;

k. Whether The Management Trust's failure to disclose material facts violated California Civil Code section 5375;

l. Whether The Management Trust's failure to disclose material facts violated California Civil Code section 5375.5;

m. Whether the interest on Plaintiff's and the Class Members' funds inured directly or indirectly to The Management Trust in violation of California Civil Code section 5380;

n. Whether The Management Trust had a fiduciary duty to Plaintiff and Class Members to disclose the benefits it obtained from its clients' money;

o. Whether the facts not disclosed by The Management Trust to Plaintiff and Class Member are material;

p. Whether Plaintiff and Class Members are entitled to compensatory damages, restitution, and the amounts of damages and restitution;

q. Whether The Management Trust should be declared financially responsible for notifying all Class Members of the earning credits it received;

r. Whether The Management Trust should be ordered to disgorge, for the benefit of Class Members, all or part of their ill-gotten profits received from earning credits and/or to make full restitution to Plaintiff and Class

Members;

188. Typicality (Rule 23(a)(3)). The claims of the representative Plaintiff are typical of the claims of Class Members, in that the representative Plaintiff, like all Class Members, is a community association that retained The Management Trust to manage their property and whose funds were deposited in banks that then paid The Management Trust earning credits on those deposits without disclosing that to the community association. The representative Plaintiff, like all Class Members, has suffered a common injury: The Management Trust violated its contractual, statutory and fiduciary duties to Plaintiff and Class Members and improperly and wrongfully profited from Plaintiff's and Class Members' funds. The factual basis of The Management Trust's misconduct is common to all Class Members.

189. Adequacy (Rule 23(a)(4)). Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving issues similar to those raised in this case. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor its counsel have any interest adverse to those of the Class.

190. Predominance of Common Questions (Rule 23(b)(3)). Common questions of law and fact predominate over questions involving individualized analysis. Fundamentally, there is no material question of fact or law that is not common to Class Members. Common issues of fact include that all Class Members entered into a contractual relationship with The Management Trust, trusted and relied upon The Management Trust to act in the best interests of their association and to fulfill its fiduciary duties. The Management Trust pursued its own interests (rather than Class Members') in banking Class Members' community funds, and The Management Trust failed to disclose its "earnings credits" arrangements with banks. The Management Trust's failure to disclose these arrangements is a common question, as is The Management Trust's improper and unjust enrichment from Class Members' deposited funds. Common questions of law include whether The Management Trust's conduct violates

California's consumer protection statutes and other law, and the Class Members' entitlement to damages and remedies.

191. Superiority (Rule 23(b)(3)). Plaintiff and Class Members have all suffered and will continue to suffer harm and damages because of The Management Trust's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the subject controversy. Because of the number of impacted Class Members, and the cost of litigation, most Class Members likely would find the cost of litigating individual claims to be prohibitive. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation because it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. There is no impediment to the management of this action because the common questions of law and fact to all Class Members are virtually identical.

**ESTOPPEL FROM PLEADING THE STATUTE OF LIMITATIONS AS A DEFENSE**

192. The Management Trust concealed material truths for decades, never disclosing either its "earnings credits" arrangement with banks in which Class Members' funds were deposited, nor the profits reaped from Class Members' deposits.

193. The Management Trust's acts of concealment also include, but are not limited to, failure to comply with statutory disclosure requirements, violating its fiduciary obligations to Class Members and failing to share the improper benefits it received from Class Members' banks.

194. Based upon The Management Trust's misrepresentations, omissions and concealment, The Management Trust is equitably estopped from asserting a statute-of-limitations defense. Plaintiff learned of Management Trust's misconduct in discussions with its counsel in the in the few months prior to filing the complaint centered upon several indicia of an earning credit arrangement— TMT's insistence on depositing Plaintiff's funds in a bank of TMT's choice, and the slow payment of vendors to maximize operating account funds. Plaintiff could not reasonably have discovered the misconduct earlier than that.

**<u>FIRST CAUSE OF ACTION</u>**

**(Breach of Contract)**

195. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 194 of this complaint.

196. This is an action against The Management Trust for breach of contract.

197. The Management Trust entered into contractual relationships with Plaintiff and Class Members. Plaintiff is informed and believes the contractual agreements were substantially uniform throughout the Class Period, and any variations were not material.

198. In exchange for the fulfillment of various duties and obligations, The Management Trust received payment from Plaintiff and the Class Members. Plaintiff has performed all duties and responsibilities required of Plaintiff under the contract.

199. The Management Trust breached its contract obligations by failing, as a fiduciary, to act in the best interest of the Class, by failing to disclose the earnings credit arrangement with Class Members' banks, failing to prioritize Class Members' financial health over The Management Trust's, and by profiting secretly from Class Members' funds.

200. Plaintiff and the Class are entitled to full disgorgement of all earning credit profits obtained by The Management Trust directly arising from Plaintiff's and Class Members' funds deposited in participating banks.

201. Plaintiff and the Class are also entitled to full recovery of all costs and attorney fees related to The Management Trust's breach of contract. On July 24, 2024, on behalf of the Class, Plaintiff sent notice of the contractual violations to The Management Trust.

**<u>SECOND CAUSE OF ACTION</u>**

**(Violation of California Unfair Competition Law- Unlawful Business Practice)**

202. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 194 above.

203. This is an action against The Management Trust for violation of California Unfair Competition Law, pursuant to the unlawful business practice prong.

204. California Business and Professions Code section 17200 *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

205. The Management Trust engaged in unlawful business practices that entailed an intentional failure to disclose, contrary to California statutes set forth in this Complaint, its "earnings credits" arrangements with banks.

206. The Management Trust's practices constitute an unlawful business practice because they violate Civil Code sections 5375, 5375.5, 5380 as well as California common law for breach of contract and breach of fiduciary duty.

207. The Management Trust violated California Civil Code §5380(b)(5) ("No interest earned on funds in the account shall inure *directly or indirectly* to the benefit of the managing agent") by secretly profiting from the interest earned on the investable balance of Plaintiff and the Class Members' bank deposits and funneling excess earnings credits as cash payments to itself.

208. To this day, The Management Trust has engaged and continues to engage in unlawful business practices by knowingly failing to disclose to Class Members the "earnings credits" and profits that it collects from Class Members' deposits.

209. As a direct and proximate cause of The Management Trust's unfair and unlawful methods of competition and unfair, deceptive or unlawful acts or practices, Plaintiff and Class Members have suffered money damage in the loss of "earnings credits" and interest unjustly received by The Management Trust.

210. As a proximate result of its unlawful practices, The Management Trust has been unjustly enriched and should be required to make restitution to the Plaintiff and Class Members pursuant to sections 17203 and 17204 of the California Business & Professions Code.

## THIRD CAUSE OF ACTION

**(Breach of Fiduciary Duty)**

211. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 194 of this complaint.

212. This is an action against The Management Trust for breach of fiduciary duty.

213. Plaintiff and the Class entered into a fiduciary relationship with The Management Trust whereby they relied on The Management Trust to act in their best interests. As a result of this fiduciary relationship, The Management Trust had a duty to act with loyalty, care and honesty and to avoid conflicts of interest.

214. Despite the existence of this relationship, and The Management Trust's duties pursuant to the relationship, The Management Trust failed to discharge its fiduciary duties to Plaintiff and Class Members by forming an undisclosed arrangement with banks to receive payments and other benefits from funds belonging to the community associations it managed. The Management Trust further violated its fiduciary duties by prioritizing its own financial enrichment above Plaintiff's and Class Members' best interests when carrying out its management duties. The Management Trust failed to disclose its conflict of interest with the banks and secret profits from Class Members' deposited funds.

215. As an agent, TMT's failure to disclose material terms of an agreement wherein it secretly profited from Plaintiff's and Class Member funds prevented Plaintiffs and the Class from the information need to make an informed decision.

216. As a direct and proximate result of The Management Trust's breaches of its fiduciary duty, Plaintiff and members of the Class have been damaged in an amount to be proven at trial.

**<u>FOURTH CAUSE OF ACTION</u>**

**(Violation of Unfair Competition Law – Unfair Business Practice)**

217. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 194 of this complaint.

218. This is an action against The Management Trust for Violation of the Unfair Competition Law, unfair prong.

219. The Management Trust engaged in an unfair business practice by knowingly failing to disclose material facts to Plaintiff and Class Members regarding its payment

arrangement and improper receipt of benefits from banks.

220. The Management Trust engaged in unfair business practices because it formed an undisclosed arrangement with banks to receive substantial payments, believed to be in excess of one million ($1,000,000) a month off of funds belonging to Plaintiff and violated its fiduciary duties to Plaintiff by prioritizing its own financial enrichment above Plaintiff's when carrying out its management duties.

221. The Management Trust violated California Civil Code §5380 (d) ("Nointerest earned on funds in the account shall inure *directly or indirectly* to the benefit of the managing agent") by secretly profiting from the interest earned on the investable balance of Plaintiff and the Class Members' bank deposits and funneling excess earnings credits as cash payments to itself.

222. The Management Trust violated California Code of Regulations Title 10, Section 2830 which makes it the policy of the state that agents managing trust fund accounts "owe[] a fiduciary duty to the client regarding the handling of the trust" and "[a]ny benefit received by the [agent] relating to the [agent's] handling of client funds in trust belongs to the client by law, and the [agent] must pass that benefit along to the client." (Section 2830 specifically contemplates that a "broker and a client for whom the broker holds funds in trust is an agency relationship" and then discusses the requirements of that agency relationship.)

223. The Management Trust violated Probate Code Section 16002(a) because it was a trustee for Riva and acted in its own interest to Riva's detriment.

224. The Management Trust's business practices outlined above are unfair because they substantially injure consumers—the associations that rely upon The Management Trust to make financial decisions in the community's best interests—to disclose any financial arrangements that involve the community's funds and to pass along savings, credits, or benefits that are accrued on its funds.

225. Here, the injury to consumers is not outweighed by any countervailing benefits to consumers or competition. Consumers receive no benefit from the excess "earnings credits" paid

to The Management Trust. The secret earnings credit arrangements harm competition by benefiting the largest community management firms, such as The Management Trust. The only party that benefits in this scenario is conglomerate management firms, such as The Management Trust, which only grow larger, richer, and more powerful as a result of these earning credit kickback schemes.

226. Finally, the injury could not reasonably have been avoided by Plaintiff and Class Members because The Management Trust has actively concealed or otherwise failed to disclose its unfair practices.

227. To this day, The Management Trust has engaged and continues to engage in unfair business practices by knowingly failing to disclose to Class Members its secret profit from Class Members' funds, secret profit that was the class members interest or interest class members could have earned.

228. As a direct and proximate cause of The Management Trust's unfair practice, Plaintiff and Class Members are entitled to restitution in the amount of the "earnings credit" payments unjustly received by The Management Trust.

229. As a proximate result of their unfair practices, The Management Trust has been unjustly enriched and should be required to make restitution to the Plaintiff and Class Members pursuant to sections 17203 and 17204 of the California Business & Professions Code.

## **FIFTH CAUSE OF ACTION**

### **(Unjust Enrichment)**

230. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 194 of this complaint.

231. This is an action against The Management Trust for unjust enrichment.

232. By means of The Management Trust's wrongful conduct alleged here, The Management Trust concealed its secret contractual arrangement with Plaintiff's and Class Members' banks in a manner that was unfair, unconscionable, and oppressive.

233. As a result of The Management Trust's wrongful conduct as alleged here, The

Management Trust has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members. The Management Trust's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged here.

234. Under the common law doctrine of unjust enrichment, it is inequitable for The Management Trust to be permitted to retain the benefits it received, without justification, from Plaintiff's and Class Members' funds in an unfair, unconscionable, and oppressive manner. The Management Trust's inequitable retention of such funds constitutes unjust enrichment.

235. The financial benefits derived by The Management Trust rightfully belong to Plaintiff and Class members. The Management Trust should be compelled to create a common fund for the benefit of Plaintiff and members of the Class with all wrongful or inequitable proceeds received by The Management Trust.

236. Plaintiff and the Class seek the disgorgement and restitution of The Management Trust's wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy The Management Trust's unjust enrichment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment against The Management Trust and in favor of Plaintiff, and to award the following relief:

1. Certification of a class consistent with the class definitions and appointment of Plaintiff as class representative;

2. Appointment of the undersigned as counsel for the proposed Class;

3. A declaration that The Management Trust is financially responsible for notifying all Class Members;

4. A declaration that The Management Trust must disgorge, for the benefit of the Class, its ill-gotten profits received from Earning Credits, and/or to make full restitution to Plaintiff and the Class Members and pay damages.

5. An award of costs and attorneys' fees, as allowed by law, and/or from a common

fund created hereby;

6. Leave to amend to conform to the evidence presented at trial; and

7. Orders granting such other and further relief as may be appropriate.

**JURY TRIAL DEMAND**

Plaintiff hereby demand a jury trial for all individual and Class claims so triable.

Dated: September 28, 2026

Respectfully Submitted,

By: */s/Michael F. Ram*
Michael F. Ram

Michael F. Ram, SBN 104805
mram@forthepeople.com
Amalee Beattie, SBN 367585
amalee.beattie@forthepeople.com
Logan Graham, SBN 364573
logan.graham@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone: (415) 846-3862
Facsimile: (415) 358-6923

Jeffrey B. Cereghino, SBN 99480
jbc@cereghinolaw.com
CEREGHINO LAW GROUP LLP
737 Bryant Street
San Francisco, CA 94107
Telephone: (415) 433-4949
Facsimile: (415) 433-7311

Colette F. Stone, SBN 129773
cstone@stonelawoffice.com
STONE &ASSOCIATES, APC
2125 Ygnacio Valley Road, Suite 101
Walnut Creek, CA 94596
Telephone: (925) 938-1555

J. Barton Goplerud (admitted pro hac vice)
goplerud@sagwlaw.com
SHINDLER, ANDERSON, GOPLERUD &

WEESE
5015 Grand Ridge Dr, Unit 100
West Des Moines, IA 50265
Telephone: (515) 223-4567

Robert Shelquist (admitted pro hac vice)
Rshelquist@cuneolaw.com
CUNEO GILBERT & LaDUCA, LLP
5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
(612) 254-7288

Alexandra C. Warren (Admitted pro hac vice)
awarren@cuneolaw.com
CUNEO GILBERT & LaDUCA, LLP
2445 M Street, NW, Suite 740
Washington, DC 20037
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

*Attorneys for Plaintiff and the Class*